Helen Jane Martina Schwerin Trust, Solana Land Company, Trustee v. Commissioner.
Helen Jane Martina Schwerin Trust v. Commissioner
Docket No. 42619.
United States Tax Court
1954 Tax Ct. Memo LEXIS 281; 13 T.C.M. (CCH) 202; T.C.M. (RIA) 54069; March 11, 1954
*281 Upon the facts, held, that properties sold were not held primarily for sale to customers in the ordinary course of business but were capital assets; gain realized upon sale is capital gain. Carl A. Stutsman, Jr., Esq., 411 West Fifth Street, Los Angeles, Calif., and John M. Schwartz, Esq., for the petitioner. John J. Burke, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner has determined a deficiency in income tax for the year 1946 in the amount of $26,872.35. The question to be decided is whether pieces of real estate, 16 lots in a subdivision, and 80 acres of unimproved land, sold by the petitioner in 1946 at a profit of $75,896.80, were held by the petitioner primarily for sale *282 to customers in the ordinary course of its trade or business within the meaning of section 117(a), I.R.C., as respondent has determined, or were capital assets, as the petitioner contends. Findings of Fact The facts stipulated are found as facts and the stipulation is incorporated herein by this reference. The petitioner filed its income tax return for 1946 with the collector for the district of Arizona. On December 31, 1937, Martin Schwerin created a trust naming Solana Land Company as the trustee. The corporation was incorporated in May, 1937, under the laws of the State of Arizona. Schwerin conveyed, transferred and delivered to Solana Land Company, Trustee, all of his title and interests in certain properties described in the Declaration of Trust, to be held in trust as the trust estate. The Declaration of Trust provides, inter alia, as follows: That the principal beneficiary of the trust is Helen Jane Martina Schwerin, daughter of the trustor, Martin Schwerin; that the trust shall be irrevocable and that the trustee is not to hold any beneficial interests other than its rights as trustee; that the term of the trust shall be during the life of Jane *283 Schwerin; that upon the death of Jane Schwerin, leaving surviving descendants, the trust corpus shall be paid and delivered to her descendants in equal shares; that if Jane Schwerin should die without leaving descendants, then the income is to be paid for 20 years, or as long as she shall live, to Arvetta Schwerin, wife of the trustor; that the entire income shall be paid to Jane Schwerin during her lifetime; that during the minority of Jane Schwerin, the trustee is authorized to pay the income of Jane to her mother, Arvetta Schwerin, who shall either pay the money to Jane Schwerin or use it for Jane's benefit; that if it shall be ascertained by the trustee that the trust income is not needed for the support, comfort, or education of Jane Schwerin, then the trustee may withhold the income from year to year during her minority, but not to exceed 16 years in the aggregate; that all or part of any income which the trustee may accumulate shall be added to the principal of the trust estate; that the trustee is to receive and collect the principal, income, rents, and profits of the trust estate; and that the trustee, after making the payments and deductions specified in the trust instrument, *284 shall pay or accumulate, and use or invest the trust income; that the trustee is authorized to hold, maintain, operate, and continue any and all property or business which it may receive under the trust instrument, and to sell, convey, partition, subdivide and lease the trust estate or any part thereof for terms within or continuing beyond the Declaration of Trust; that the trustee is authorized to mine or drill for and remove from the property any minerals, gases or oils, to improve the property and remove, substitute, after or repair any improvements thereon, or add improvements thereto; that the trustee is authorized to invest principal and income, if accumulated in the property; that the trustee is authorized to sell to the trust any of its own securities, or purchase therefrom for its own use at the reasonable value thereof; and that the trustee shall have full power, discretion and authority in all respect to handle, manage, operate and dispose of the whole or any portion of the trust estate under the terms of the trust. The Declaration of Trust, dated December 31, 1937, is incorporated herein by this reference. At the time the above trust was created, the beneficiary, Jane *285 Schwerin, was four years of age. Solana Land Company, hereinafter referred to as the trustee, has never had any activity or business other than acting as trustee of the trust created on December 31, 1937. The articles of incorporation of Solana Corporation are incorporated herein by this reference. During 1946, the outstanding stock of the trustee-corporation consisted of 17 shares which were held as follows: Arvetta Schwerin held 16 shares, and Richard Chambers held one share, which was a qualifying share to enable Chambers, the attorney for the corporation, to serve as a director. During 1946, Arvetta Schwerin was president of the trustee-corporation, and Martin Schwerin was secretary-treasurer. All of the income of the trust received during 1946 was accumulated by the trustee and reported as income in the return of the trustee. In the fiduciary income tax return for 1946, which was filed for the trust, income from securities was reported, and long-term capital gains from the sales of 16 lots in Tucson and 80 acres of land in Pima County, Arizona. The 16 lots were sold by the trustee of the trust in 1946, individually and to different purchasers, for the total sum of *286 $50,550, and from these sales the net proceeds amounted to $45,157.75. The cost basis of the 16 lots in the hands of the trustee was $4,461.92, or $278.87 per lot. The net gain realized upon the sale of the 16 lots was $40,695.83. The trustee, on or about April 4, 1946, sold as one parcel, an 80-acre tract of land for a gross selling price of $48,000. The expenses of the sale amounted to $2,660.80 and the net amount of the selling price was $45,339.20. The net gain realized upon the sale amounted to $35,200.97. In the fiduciary income tax return of the trust for 1946, the trustee reported the net gain from the sale of the 16 lots as $35,326.46, and gain from the sale of 80 acres of land was reported as $35,200.97. One-half of the gain, $35,263.72 was reported in the return as long-term capital gain. The parties have stipulated that the net gain from the sales of the lots and acreage were, respectively, $40,695.83 and $35,200.97. Martin Schwerin is a mining engineer; he received his degree in 1900. Schwerin first went to Tucson in 1902. Thereafter, he visited Tucson from time to time in connection with his work as a mining engineer. He established his residence in Tucson in 1936 *287 and since that time he has maintained his residence there. He purchased a home in an area known as El Encendo in 1936, where he lived until 1939 when he bought a house in an area known as Colonia-Solana, to which he moved in December 1939. He lived in the house in Colonia-Solana until December 1944, and then the house was sold and the family took a trip to the Carribbean. When Schwerin and his family returned from their trip, in 1945, he rented houses where he and his family lived. In 1936 and thereafter until about 1952, Schwerin was one of the owners of a mine in Illinois and was the general manager of the mine. After establishing his residence in Tucson in 1936, Schwerin spent his winters in Tucson and went to the mine in Illinois each year, except during the war years when transportation was difficult. In 1936, upon deciding to make Tucson his residence, Schwerin bought several parcels of unimproved land in the Tucson area, namely, a section of land on Wilmot Road, several miles east of Tucson; a section in the hills north of Tucson; an 80-acre tract in Pima County, outside of Tucson, on Broadway, at a cost of $10,138.23; and an undivided one-half interest in an 80-acre tract *288 outside of Tucson on River Road. In 1936, Schwerin also bought 78 lots in a subdivision adjoining the city of Tucson, known as Colonia-Solana. These lots were all of the lots remaining in that subdivision. The 78 lots, including a water plant on the property, were purchased for the total sum of $42,500. The subdivision, platted in 1928, originally contained 122 lots, of which 44 had been sold prior to 1936 before Schwerin bought the remaining 78 lots. About 20 of the 44 lots had been improved by the building of houses thereon. Upon the creation of the trust for the benefit of Jane Schwerin on December 31, 1937, Martin Schwerin conveyed to the trust, as the original corpus thereof, the 80 acres of unimproved land im Pima County, referred to above, which he had purchased for $10,138.23, together with other property which is not involved in this proceeding. The cost basis in the hands of the trust of the 80-acre parcel was $10,138.23. Schwerin did not, in 1936, or at any time prior to May 1944, convey to the trust any of the 78 lots in Colonia-Solana. Between the time of the purchase of the 78 lots in Colonia-Solana, in 1936, and the beginning of May 1944, Schwerin sold from time *289 to time 18 of the 78 lots, leaving 60 lots remaining unsold in that subdivision. The Commissioner has made allocation of the cost basis between two groups, 41 lots and 19 lots; the 19 lots having a basis of $139.43 per lot; the 41 lots having a basis of $278.87 per lot. None of the lots sold in 1946 had a cost basis of $139.43. The sales of the 18 lots in the Colonia-Solana subdivision which were made by Schwerin between 1936 and May of 1944 were as follows: one lot was sold in 1937; one lot was sold in 1938; six lots were sold in 1940; 3 lots were sold in 1941; two lots were sold in 1942; three lots were sold in 1943; and two lots were sold in 1944 prior to May, total 18. In May of 1944, Schwerin conveyed the remaining 60 lots in Colonia-Solana subdivision to the trust as an additional gift of property. During the period from the creation of the trust to the year 1942, Martin Schwerin purchased and gave to the petitioner trust three parcels of unimproved land, namely, a tract of 520 acres on Orange Grove Road in Tucson which he acquired in 1939; an 80-acre tract on Wilmot Road, Tucson, which he acquired in 1936; and a tract of 77 acres on Broadway, in or near Tucson. After *290 making the gift of 60 lots in Colonia-Solana to the trust in May 1944, Schwerin did not, himself, own any interest in real property in Arizona, and since May 1944, he has not acquired any interest in any land in Arizona. Solana Corporation, the trustee, has never, for its own or for the trust, purchased any real estate or acquired any real property in any way. The only way the trust has received any real property or interests therein has been through gifts. No real property or interest therein, other than that above described, has ever been transferred to the petitioner. Since May 1944, the petitioner trust made sales of lots in the Colonia-Solana subdivision in each of the years 1944-1953, inclusive, except 1950 and 1951. During the period 1944 to April 29, 1953, the number of lots sold each year were as follows: Year
No. Lots Sold
1944
1
1945
7
1946
16
1947
4
1948
4
1949
2
1952
6
1953
3 Each lot was sold individually to an individual purchaser. Since the creation of the petitioner trust in December 1937, the trust has sold acreage as follows: Year
Acreage
1945
20-acre Tract on Broadway
1946
80-acre Tract on Broadway
1951
80-acre Tract on Wilmot Road
1953
57-acre Tract on Broadway
*291 The acreage on Broadway, 20 acres of which were sold by the petitioner-trust in 1945, and 57 acres of which were sold in 1953, was acquired by Martin Schwerin in 1942 as one tract consisting of 77 acres. As of the time of the trial of this proceeding, the petitioner-trust estate owned the following, remaining real estate out of the realty which had come into its possession by gift from the grantor of the trust: 17 lots in the Colonia-Solana subdivision; a section of land on Wilmot Road; a section of land in the hills north of Tucson; an undivided one-half interest in an 80-acre tract on River Road; and 520 acres on Orange Grove Road. Neither Martin Schwerin nor Solana Corporation ever had a real estate broker's license. No tract office was ever maintained on the Colonia-Solana subdivision; the trustee never maintained a permanent office in any location; the trustee had no activities other than those of acting as trustee. The trustee did not have a telephone listed. Martin Schwerin had no telephone listing from 1944 to 1951, but he did have the use of various telephones listed in the names of the owners of the houses which he rented. Martin Schwerin, as secretary-treasurer of *292 Solana Corporation kept no records other than cancelled checks and bank statements. There were no fixed prices put on any of the lots in the Colonia-Solana subdivision. All of the lots in the Colonia-Solana subdivision were residential building lots. The original subdivider laid out streets and provided water. When Schwerin purchased the lots in 1936, the subdivision was in a rundown condition and was unattractive to a prospective purchaser. Weeds had grown on the lots and the trees had not been watered. Schwerin took no action to improve the attractiveness of the lots or to prevent the property from becoming further run-down. No improvements were made. No additional trees were planted, nor was any attention given to the trees already on the property, many of which died for lack of water. Neither he, nor the trustee, nor any other person invested or expended any money in maintenance, or took any action to improve the lots subsequent to Schwerin's acquisition of the property in 1936. Schwerin rejected an offer of a local real estate broker to invest between $1,500 and $2,000 to improve the property and to enhance its attractiveness. The petitioner, the trust, never took any action *293 to dispose of any of the Colonia Solana lots. It did not advertise; it did not put any flags, displays, or signs upon the lots indicating that the property was for sale; the erection of such displays was not authorized. Some local real estate agents, without authorization, put small signs containing only their names on the property. When Schwerin purchased the lots, a large sign identifying the subdivision was located on one of the corner lots. This sign was approximately twenty or twenty-four feet long and fifteen or eighteen feet high. It remained on the property for from six to eight years, after which it was blown down and was sold for salvage. This sign was not replaced. It was not on the property in 1946. No brokers or agents, exclusive or otherwise, were ever employed or appointed by petitioner to sell any of the lots. The sales in 1946 were made through ten different brokers. These sales were not solicited by Schwerin or by the trustee. A broker who had a prospective purchaser usually would call Arvetta Schwerin, or Martin Schwerin, and inform Schwerin that there was a prospective purchaser for a particular lot. Schwerin would inform the broker whether the specified lot *294 was available and if so, the price. A broker's commission was paid on the sale of each lot. There were no mortgages or deferred payments of any kind involved in the sales in 1946 by petitioner. All property sold was fully paid for in cash and the proceeds were reinvested by the trustee in Canadian mining securities. Schwerin purchased and held the properties in question, the lots and the acreage, for investment purposes; they appeared to be good investments. The properties were not acquired for immediate resale., they were purchased with a view towards an eventual disposition at some indefinite future time. The petitioner-trust was created by Schwerin primarily to build an estate to secure the future of his daughter, and the properties were conveyed to petitioner for this purpose only, and not for the purpose of promoting sales or engaging in a business of selling real estate. The petitioner-trust held the property in question primarily for investment purposes during and before 1946. The activities of the petitioner in 1946 did not constitute carrying on a real estate business; the petitioner was not a dealer in real estate. The lots and acreage sold by petitioner in 1946 *295 were not held by it for sale to customers in the ordinary course of a trade or business. All of the real estate sold by petitioner in 1946 were capital assets. Opinion Whether the profit realized by petitioner from the sales in 1946 of 16 lots and an 80-acre tract was ordinary income rather than capital gain depends upon whether the property was "held by the taxpayer primarily for sale to customers in the ordinary course of [its] * * * trade or business." Section 117(a),(j),(el), I.R.C. The question is essentially one of fact. Rubino v. Commissioner, 186 Fed. (2d) 304; King v. Commissioner, 189 Fed. (2d) 122, 124; Mauldin v. Commissioner, 195 Fed. (2d) 714, 716. Several tests have been employed to determine whether real property consisting of either acreage or lots is a capital asset within the meaning of section 117(a), I.R.C., so as to give rise to capital gain upon disposition. In general, they turn upon the substantiality, frequency, and quality of the taxpayer's activity in handling the property. See Phipps v. Commissioner, 54 Fed. (2d) 469. In determining whether property *296 is presently "held * * * primarily for sale to customers in the ordinary course of [the taxpayer's] trade or business", the courts look to past conduct with respect to the acquisition, development, and disposition of the property. See Martin Dressen, 17 T.C. 1443, 1447; W. T. Thrift, Sr., 15 T.C. 366, 369; McFaddin v. Commissioner, 148 Fed. (2d) 570; Fahs v. Crawford, 161 Fed. (2d) 315; Ehrman v. Commissioner, 120 Fed. (2d) 607; Harriss v. Commissioner, 143 Fed. (2d) 279; Freida E. J. Farley, 7 T.C. 198; Carl Marks & Co., 12 T.C. 1196, 1202. Judged by these standards, the evidence convinces us that petitioner's activities in 1946 were not sufficient to constitute a holding of the real property, the lots and the acreage, primarily for sale to customers in the ordinary course of business. Petitioner, a trust, received the properties in question by gift. The donor acquired and held the properties for investment purposes. His purpose in conveying the properties to petitioner was to establish an estate for his daughter. The trustee of petitioner was authorized to sell trust assets *297 and reinvest the proceeds. The petitioner received the tract where the lots were located as a subdivided tract, and the acreage as raw, unimproved land. The petitioner was passive; it did not improve the tract or the acreage; or advertise the lots or the acreage, or promote a sales campaign, or hire a broker to sell the properties. In this respect, the facts here resemble those in the Farley, Crawford and Dressen cases, and here, as in those cases, sales were made only as a result of the initiative of the purchasers. The number of sales of lots in 1946 was a small percentage of the total number of lots. The objective of liquidation of assets is clearly apparent in the sales of both the lots and acreage. The activities of petitioner were not sufficient to constitute the carrying on of a real estate business, and to convert property, which had been held for many years for investment, into property held primarily for sale to customers in the course of a business. Phipps v. Commissioner, supra.Sales of 16 lots and of the acreage in 1946 were not, in the light of the entire record, a substantial volume of sales. The evidence shows that sales were gradual, and under the *298 principles of Burnet v. Harmel, 287 U.S. 103, we conclude that petitioner is entitled to have application of the capital gains provisions of the statute to all of the property sold. Upon all of the evidence, we are convinced that the properties in question were not held by petitioner for sale in trade or business during 1946. Therefore, the profit realized by petitioner was capital gain rather than ordinary income. Because of agreed adjustments in the basis of the lots which were sold, a Rule 50 recomputation is necessary. Decision will be entered under Rule 50.