W. J. Lewis, Jr., and Bessie H. Lewis v. Commissioner.
Lewis v. Commissioner
Docket No. 44179.
United States Tax Court
T.C. Memo 1954-232; 1954 Tax Ct. Memo LEXIS 13; 13 T.C.M. (CCH) 1161; T.C.M. (RIA) 54337; December 23, 1954, Filed George Witcher, Esq., 410 Brown Marx Building, Birmingham, Ala., for the petitioners. Homer F. Benson, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: This proceeding involves deficiencies in income tax for the years 1944 to 1949, inclusive, and a fraud penalty for 1944 as follows: Year
Deficiency
Penalty
1944
$9,368.34
$4,684.17
1945
1,016.96
1946
3,248.02
1947
2,074.77
1948
824.88
1949
3,060.12
The issues are: (1) Whether the net worth statements from which the deficiencies were determined in 1944, 1948, and 1949 properly reflect taxable income; (2) Whether the fraud penalty was properly imposed; (3) Whether gain derived in 1945, 1946, and 1947 from sales *14 of lots is taxable as ordinary income or as capital gain; and (4) Whether certain amounts are deductible as expenses of sale of the lots. Findings of Fact Petitioners are husband and wife and reside in Birmingham, Alabama. For each of the years 1944 to 1947, inclusive, the husband filed individual returns, and for 1948 and 1949, he and his wife filed joint returns with the collector of internal revenue for the district of Alabama. The husband will be referred to hereinafter as the petitioner. From March 1942 through the taxable years petitioner owned and operated a cafe in Birmingham known as the Arrow System Sandwich Shop, and engaged in gambling on elections and sporting events, including baseball, football, basketball, and horse racing. The cafe was open 24 hours a day, 7 days a week. Petitioner placed many of his bets throughout the taxable years with E. W. Curd, a betting commissioner or broker, in Lexington, Kentucky. Some of Curd's customers placed their bets with petitioner. At times petitioner had from $5,000 to $20,000 in his possession belonging to Curd, remittances of which were made to him by check or in currency. Petitioner did not have a bank account in his *15 name. He had a bank account in the name of his wife against which he was authorized to draw checks. Petitioner had a bank safety deposit box in and after 1942 in which he made deposits of cash belonging to himself and Curd. Such books of account as were kept and preserved by petitioner related only to his cafe business and were inadequate to determine his liability for income tax in 1944, 1948, and 1949. He tried to keep a "little book" covering his gambling activities but destroyed it because he thought that it could be used against him if it were found by local law enforcement authorities. On November 8, 1941, petitioner sold a pie business for $4,000 cash, plus an amount for inventory in excess of that amount, and $3,500 evidenced by notes, each for $100 payable monthly at 6 per cent interest. On the same date petitioner received three 6 per cent notes totaling $1,889.40, one for $1,000, dated November 8, 1942, and two each for $444.70, maturing on May 8, 1943, and November 8, 1943, respectively, in a sale of real property. The notes were paid on maturity. The return filed by petitioner for 1944 reported net income of $4,786.70, including $1,265 of net income from wagering. *16 The respondent determined by the net worth method that petitioner had net income in that year of $25,887.13, or $21,100.43 in excess of the amount reported, consisting of $21,323.95 as increase in net worth during the year, $4,000 for living expenses, and $563.18 for Federal income tax payments. He included in the net worth statement $316.71 and $628.49 for cash in bank at the close of 1943 and 1944, respectively, and $25,000 at the close of 1944 for a mortgage payable to Curd. The starting net worth statement does not include the amount of $1,000 for notes receivable which were received by petitioner in 1941 in connection with the sale on November 8, 1941, of the pie business. All of the notes were paid in 1944. Prior to the determination of the deficiency and penalty for 1944, William W. Duffey, the revenue agent who prepared the net worth statement, discussed the various items in the statement with petitioner and his accountant and attorney. The latter did not suggest that petitioner had assets other than those listed in the statement. The accountant and attorney claimed that petitioner had additional liabilities at the close of 1944, consisting of debts to gamblers, but nothing *17 was offered to support the assertions. Petitioner did not, during the course of the conference and interview, contend that he had $9,500, or any amount approximating that sum of cash, on hand on any date, but asserted that he always had some cash on hand belonging to Curd, from which he made payments for the account of Curd. On July 27, 1944, petitioner and F. E. Dunlap jointly purchased 56 lots in a subdivision, known as Shades Valley Gardens, improved with streets and other improvements, with the understanding that each would take every other lot. The full purchase price of $26,500 for the lots was advanced by petitioner in currency, in consideration of which Dunlap agreed to pay petitioner when the purchase was closed, $2,500 in cash and give him 7 notes, totaling $10,750, secured by a first mortgage on his 28 lots. The mortgage was executed on July 28, 1944. On November 15, 1944, petitioner executed a note in favor of Curd for $25,000, payable on or before one year later, with interest at the rate of 6 per cent per annum, and secured by a real estate mortgage executed by petitioner and his wife. The indebtedness evidenced by the note was included as a liability in the net worth *18 statement respondent prepared for 1944. The note was paid in full prior to October 1947. On November 17, 1944, petitioner gave to Curd a 6 per cent note in the amount of $13,000, maturing on or before two years after date, and secured by shares of stock and the 7 notes, totaling $10,750, he held of Dunlap. The liability is not included in the net worth statement prepared by respondent for 1944. The note was paid in installments in 1945, 1946, and 1947. The transaction between petitioner and Dunlap for the purchase of the 56 lots in Shades Valley Gardens was the outcome of a remark made by petitioner to Dunlap, a building contractor, that he was interested in making a joint purchase of property with him at a bargain price. Each paid one-half of the purchase price but it was necessary for Dunlap to borrow $10,750 from petitioner to pay his share of the cost of the property. In September 1944 petitioner and Dunlap made a joint purchase of acreage adjoining the 56 lots and thereafter in 1944 and 1945 subdivided some of it into lots, of which petitioner received 7 as his share of the property. Petitioner did not list the lots with a real estate broker, advertise the lots for sale, *19 or personally solicit purchasers of the property. Dunlap, acting for himself and petitioner, offered the lots for sale and endeavored to get contracts to build houses on the lots sold by him. Petitioner agreed to pay Dunlap a fee of $50 for each lot sold belonging to him. Petitioner was anxious to sell his lots as promptly as possible to meet demands being made by Curd for payment of the notes he held of petitioner, and urged Dunlap to exert greater effort to sell the property. The lots and acreage were offered for sale at all times until the last parcel was sold in 1947. Of the 35 lots and acreage in the two tracts, 5 lots and the acreage were sold in 1945, 17 lots in 1946, and the remaining 13 lots in 1947. Petitioner paid the following amounts in connection with the sale of each lot: Commission to Dunlap $50
Attorney fee
25
Title insurance
15
Stamps, taxes, conveyances
.11 per hundred
dollars of
sales price
Petitioner paid the following amounts as sales expenses in connection with the sale in 1947 of a parcel of real estate known as Block M. Rosedale: commission, $625; title, $50; attorney fees, $25. The sales made in 1945 of 5 lots in Shades *20 Valley Gardens were not reported by petitioner in the income tax return he filed for that year. He reported the sale of 22 and 13 lots in his returns for 1946 and 1947, respectively, taxable as capital gain. Respondent in his determination of the deficiencies for 1945, 1946, and 1947 allowed no amount as expenses paid on account of the sale of the lots, the acreage, and the Block M. Rosedale property. He determined that the gain realized on the sale of the lots and acreage was taxable as ordinary income. The returns filed by petitioner for the years 1945, 1946, and 1947 reported net income of $5,273.74, $7,523.51, and $10,694.53, respectively. The joint returns of petitioners for 1948 and 1949 reported net income of $6,596.78 and $5,882.57, respectively. The return for 1949 included no amount of gambling activities. The books of account kept by petitioner for his cafe business for 1948 and 1949 consisted of a bound ledger containing entries made monthly to reflect total expenditures during the month for food, wages, and other expenses. The amount entered each month was given to the bookkeeper by petitioner. The books and records of petitioner did not clearly reflect his income *21 in 1948 and 1949. The return for 1948 reported a net profit of $7,476.28 from the operation of the cafe, based upon receipts of $98,425.52, and cost of goods sold and expenses aggregating $90,949.24. Of the receipts, $63,137.04 was deposited in a bank and $24,751.80 was withdrawn by checks to operate the business. Similar facts prevailed in 1949. By using the net worth expenditure method of computing income tax liability, respondent determined that petitioner had net income of $10,915.07 in 1948 and $19,431.27 in 1949. The net worth statements contain no amount for cash on hand. The additions to increase in net worth in 1949 include, as a personal expense, payments aggregating $11,161.12 to Curd. During 1949 petitioner earned $3,500 for services rendered to Curd in that year, all of which was credited to him on the books of Curd. Instead of paying the amount to him, Curd permitted petitioner to gamble against the credit, and as a result he lost the entire amount. Opinion The parties stipulated that the net worth statement used by respondent in determining petitioner's net income for 1944 is correct to the extent of the assets and liabilities shown therein. They differ on *22 the amount of petitioner's net income for that year only on whether the starting net worth statement should include notes receivable in the amount of $1,152.50, and the additional amount of $9,500 for cash in a safety box, and whether the net worth statement for 1944 should include $13,000 for an additional liability. The uncontradicted testimony, strengthened by documentary evidence, is that at the close of 1943 petitioner held promissory notes in the aggregate amount of $1,000 which he received in 1941 in connection with the sale of the pie business, all of which were paid in 1944. To that extent we sustain the contention of petitioner that the assets held by him on January 1, 1944, should include an additional amount for notes receivable. The contention of petitioner that he had about $9,500 in cash in a safety deposit box at the close of 1943 is based upon testimony of petitioner that he had cash of from $3,000 to $5,000 after he opened his cafe in March 1942, and that collections amounting to $4,292.28 under the notes he received in the sale of his pie business were deposited in the box. Petitioner did have such a box and testified that he had "around $9,500.00" in the box *23 at the close of 1943. The problem is whether the testimony of petitioner, an interested witness, is sufficient to overcome the presumptive correctness of respondent's finding that petitioner had no cash on hand at the close of 1943 other than the bank balance, the amount of which is not in dispute. The testimony is not only uncorroborated but is inconsistent with the silence petitioner maintained when the accuracy of the net worth statement was the subject of a conference before the deficiency was determined. No explanation appears in the evidence to account for the conflict in positions and we may not assume that such an important item affecting his tax liability could have been overlooked. The accountant and attorney who participated in the conference with petitioner might have been able to shed some light on the conflict of positions, but they did not take the stand as witnesses for petitioner. The fact that amounts were deposited in the box means nothing for he was able to remove it as readily as he was able to deposit it. If we were to assume that he had some cash in the box at the close of 1943, logic would require that it be offset by a like amount at the close of the taxable *24 year. Neither was petitioner's wife, who operated the pie business and jointly sold it with him, offered as a witness to corroborate the story of accumulated cash. Evidence on the point is not, in our opinion, sufficient to overcome the finding of respondent to the contrary. The liability of petitioner to Curd in the amount of $13,000 under the secured note he executed on November 17, 1944, was not reflected in the net worth statement for 1944 because petitioner was unable to support his claim by documentary proof. Testimony before us on the execution of the note is corroborated by documentary evidence. Respondent asserts on brief that there is no proof of the use made of the amount and that if the debt was incurred, as it was, it is reasonable to assume that the obligation resulted from gambling losses, in which event it would not be deductible without gambling gains as an offset. Petitioner testified that the money borrowed on the note, together with $25,000 evidenced by the note given to Curd two days earlier, and $9,500 of cash in his safety box at the close of 1943, was used to pay for the lots in Shades Valley Gardens. That property was purchased in July 1944 at a total *25 outlay by petitioner of not in excess of $26,500. Clearly, any money obtained from Curd for the note was not used for that purpose. The liability, however, was outstanding it the close of 1944 and, therefore, is a proper offset against assets at that time to arrive at net worth. The evidence does not disclose what use petitioner made of the money, if any was actually received, but since nothing was paid on the note in 1944 there is no ground for adding to the increase in net worth during that year any amount for personal or other nondeductible expenses, even though we adopted the assumption suggested by respondent. Accordingly, net worth at the close of 1944 will be decreased by the amount of $13,000 to reflect the liability. Respondent argues on brief that petitioner's failure to report in excess of 300 per cent of the net income shown in the return, with no explanation of the source of the income not reported; the absence of records adequate to determine net income, and apparent expenditures of substantial amounts of cash, with other evidence, disclose intent "to defeat or evade tax" with fraudulent intent. About two-thirds of the unreported income determined by respondent *26 has been eliminated by errors in the net worth statements. No proof was made that petitioner had any source of income other than from gambling activities and his cafe business, from both of which he reported net income. The evidence offered on the inadequacy of the records kept for the cafe establishes, at most, nothing more than negligence. Petitioner kept a record of his gambling operations and destroyed them for fear they might be found by local law enforcement officers. Petitioner reported $1,265 of net income from wagering activities and respondent made no proof of greater taxable income from that source, or that petitioner's record of gambling was destroyed before he filed his return. We find nothing in the facts specifically relied upon, or in other evidence, establishing fraud clearly and convincingly as required by the burden of proof respondent had under the issue. Aside from expenses of sale, which, with expenses paid in connection with the sale in 1947 of the Rosedale property, are deductible in the amounts set forth in our findings, the only difference between the parties on the sales of lots and acreage is whether the resulting gain is taxable as ordinary income, as *27 determined by the respondent, or as capital gain, as reported by petitioner in his returns for 1946 and 1947. The controlling question under the issue is whether the lots were "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Section 117(a)(1), Internal Revenue Code of 1939. The issue is factual and there is no decisive rule to apply, but the courts have recognized certain tests as helpful. They include the reason for the acquisition and disposal of the property, the frequency and continuity of sales, the extent of improvements, and activities engaged in to make sales. W. T. Thrift, Sr., 15 T.C. 366; Martin Dressen, 17 T.C. 1443; Stockton Harbor Industrial Co. v. Commissioner (C.A. 9), 216 Fed. (2d) 638, (Nov. 1, 1954). The facts that the sales were made to liquidate an investment in order to obtain funds to pay outstanding obligations; that another activity occupied most of the time of petitioner, and that he did not engage in making sales, are not controlling. Sales for liquidation purposes do not preclude a finding that a trade or business was being conducted, Ehrman v. Commissioner, 120 Fed. (2d) 607; *28 a taxpayer may engage in more than one business, George J. Wibbelsman, 12 T.C. 1022; and a trade or business may be conducted through agents, Brown v. Commissioner, 143 Fed. (2d) 468. Neither is it controlling that the petitioner found it necessary to loan Dunlap $10,750 in order to carry out the joint contract to purchase the lots. The transaction was entered into in 1944 for profit. Within two months adjoining land was acquired and subdivided into lots and improved by expenditures made in that year and 1945 The lots and a small tract of the acreage not subdivided were promptly placed on the market for sale, with Dunlap, a home builder desirous of obtaining a construction job in connection with each sale made, acting as petitioner's agent or broker on a commission basis. The desire of petitioner to dispose of the property as soon as possible is shown by the pressure he put on Dunlap to increase his efforts to sell. No proof was made that the property was not offered for sale at all times to the general public, or that Dunlap, as selling agent, did not actively engage in the solicitation, through advertisements and otherwise, of offers to purchase. The success *29 of his efforts is shown by the fact that all of the parcels were sold within about three and one-half years after acquisition without any evidence of interruption of selling activity. From a consideration of all of the evidence we find no error in respondent's determination that petitioner held the property for sale to customers in the ordinary course of a trade or business conducted by him. The parties introduced into the record as a joint exhibit a net worth expenditure statement disclosing taxable income of $13,591.59 in 1948 and $16,517.85 in 1949, and agreed upon the accuracy of the various assets and liabilities listed in the schedule, subject to the right to prove additional items. They also agreed to the amounts added to increase in net worth each year for personal and living expenses, except for $1,328.63 and $7,661.12 shown as payments to Curd in 1948 and 1949, respectively. Petitioner does not, on brief, contend for any adjustments in net worth statement for 1949. As to the year 1948 he argues that the starting and closing net worth statements for that year should include $15,000 and $5,000, respectively, for cash on hand. Petitioner testified before us that he had *30 about $15,000 of cash on hand on January 1, 1948, most of which he said was at his home and that the remainder was in a box at his place of business and in a bank safety deposit box. He endeavored to support his testimony by evidence of receipts in 1945, 1946, and 1947 of about $27,000 in excess of disbursements. The corroborative evidence proves nothing material. If it were reasonably reliable as proof petitioner should have had about $27,000 of cash on hand, instead of $15,000 as alleged. Moreover, it conflicts with other testimony of petitioner. Under questioning by special agents of the Treasury Department in October 1951, petitioner testified under oath that he did not have in excess of $500 on hand at the beginning of 1947 or the close of 1949; that "I never could get cash on hand" and that "We might build up our betting pot a little and someone would come along and take it off our hands." Such testimony is opposed to the idea that $15,000 of cash was on hand at the beginning of 1948, as petitioner now asserts. Petitioner admits here that his bank account, kept in the name of his wife, had an overdraft of $913.24 at the close of 1947. Why he overdrew his account with around *31 $15,000 of undeposited cash on hand is not explained. The condition of his checking account at that time, together with overdrafts of lesser amount at the close of 1948 and 1949, is consonant with the testimony of petitioner before the special agents that he had no large amount of cash on hand at any time. The testimony of petitioner before us has earmarks of an afterthought. In any event, we are not warranted in finding from the evidence offered that petitioner had $15,000 of cash on hand for reflection in the starting net worth statement. Inclusion of $5,000 for cash on hand at the close of 1948 would increase petitioner's net worth for that year by a like amount. Petitioner's willingness to concede the existence of the assets appears to be due to knowledge that it would be fully offset if we sustained his contention as to the $15,000 item just discussed. Respondent is not asking that the amount be included, in view of which no adjustment will be made. The only other question about which the parties now differ is whether payments to Curd in 1949 for personal expenses, an addition to increase in net worth, should include the $3,500 which petitioner earned in the performance *32 of services for Curd and then lost in gambling activities with him. Petitioner's theory is that gambling contracts being illegal and void under the laws of Alabama, the state in which he resided, and Kentucky, the state where Curd had his place of business, the losses from wagering are not valid offsets against the compensation, and as a result the debt is still owed by Curd and there was no expenditure of the amount as a personal expense to treat as an addition to increase in net worth. The contention ignores uncontroverted facts. The compensation was fully earned but was not actually paid to petitioner. Constructive payment was made in 1949 by charges against the credit with the consent of petitioner for gambling losses incurred after the income was earned. It does not appear that petitioner ever asserted a claim against Curd for the compensation on the ground that the gambling losses were not a valid offset, even though made with this agreement. Nothing of evidence is opposed to the idea that petitioner at all times recognized that the liability of Curd to him for services was validly satisfied by charges of Curd against him for wagering losses. There can be no doubt but that *33 the compensation, having been thus used, was constructively received. Old Colony Trust Co. v. Commissioner, 279 U.S. 716. Gambling losses are deductible only to the extent of gains from that source. Section 23(h), I.R.C. of 1939. The fact that gambling may be illegal in Alabama and Kentucky does not make wagering losses deductible from gross income. Skeeles v. United States, 95 Fed. Supp. 242; Roy T. Offutt, 16 T.C. 1214. Accordingly, respondent committed no error in adding the amount to increase in net worth as a personal expense. Decision will be entered under Rule 50.