Kathryne M. Glover v. Commissioner. George H. Glover and Kathryne M. Glover v. Commissioner. George H. Glover v. Commissioner.
Glover v. Commissioner
Docket Nos. 50666-50668.
United States Tax Court
T.C. Memo 1955-329; 1955 Tax Ct. Memo LEXIS 8; 14 T.C.M. (CCH) 1289; T.C.M. (RIA) 55329; December 21, 1955
George L. Cassidy, Esq., Dime Building, Detroit, Mich., and William C. Loud, Esq., for the petitioners. Robert J. Fetterman, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies in the income tax of petitioners as follows: Dkt.
Defi-
Petitioner
No.
Year
Ciency
Kathryne M. Glover
50666
1944
$ 198.00
1946
7,977.80
1947
981.33
George H. Glover and
Kathryne M. Glover
50667
1945
163.00
1948
3,957.04
1949
3,068.30
George H. Glover
50668
1944
198.00
1946
7,887.55
1947
962.34
The issue common to all proceedings is the correctness of the respondent's action in determining that gains realized *9 by petitioners from real estate transactions in 1944, 1945, 1946, and 1947 are taxable as ordinary income. Additional issues presented in the proceeding of George H. Glover and Kathryne M. Glover, Docket No. 50667, were abandoned by petitioners' counsel at the hearing. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, George H. Glover and Kathryne M. Glover, are husband and wife. Petitioners filed individual income tax returns for 1944, 1946, and 1947 with the collector at Detroit, Michigan. Amended individual income tax returns for 1944 were filed by them on May 15, 1947. They filed joint income tax returns for 1945, 1948, and 1949 with the collector at Detroit, Michigan. George H. Glover, hereinafter referred to as petitioner, after having engaged in a variety of sales activities since 1928, obtained a real estate broker's license from the Michigan Corporation and Securities Commission in 1935 and began business as a real estate broker in that year. In 1939, petitioner constructed 2 houses in Elyria, Ohio, both of which he sold upon completion. In 1941, petitioner obtained a license from the Michigan Corporation and Securities *10 Commission to operate as a builder. The license expired in 1943 and was renewed in April 1946. During 1941 and 1942, petitioner engaged in residential construction in Detroit, Michigan. He constructed 8 houses for sale in 1941 and 4 houses for sale in 1942. The majority of the houses were constructed on a contract basis for individual purchasers who furnished funds for their construction. The remainder were built on a speculative basis and held for sale upon completion. Each of the 14 houses constructed by petitioner from 1939 to 1942 was sold at a profit of from $600 to $800. During 1942 there developed a serious housing shortage in the Detroit area. Petitioner's building activities were interrupted in 1942 by Government restrictions on wartime construction. He found that he could continue the construction of private housing in the Detroit area only by obtaining a priority rating from the War Production Board for the construction of war housing units. In July 1942, petitioner applied for and received two priorities for the construction of 15 and 24 housing units, respectively. He subsequently received another priority for the construction of 51 housing units, enabling him *11 to build a total of 90 housing units. The houses sold during the years here in issue were built pursuant to these three priorities. Two of the 90 houses were sold in 1943 and consequently are not here involved. In the applications for the priorities, petitioner agreed to comply with the rules of the National Housing Agency. The defense housing regulations restricted the sale of houses built during the war years and imposed a ceiling of $6,000 on selling prices and $50 per month for rental. Prior to the lifting of Government restrictions on the sale of war housing on October 15, 1945, petitioner could not sell any of the houses without first obtaining the approval of the Federal Housing Administration. Several of the houses constructed and rented during the war years were leased with the understanding that the approval of the Federal Housing Administration permitting the sale of the houses to the tenants would be obtained. Pursuant to an order of the War Production Board and the National Housing Agency, effective October 15, 1945, all controls and restrictions relating to the occupancy (except rent ceilings) and disposition of war housing were terminated. Petitioner purchased vacant *12 land from two Detroit real estate companies and erected thereon the 90 housing units for which priorities had been obtained. Title to the land was held by petitioners as tenants by the entireties. The houses were rented under rental agreements providing for tenancies from month to month. Among other provisions, the rental agreements reserved to the owner the right to enter the houses for the purpose of showing them to prospective purchasers. All of the 90 houses constructed by petitioner during the war years were rented at some time during 1943 or 1944. Most of them were rented for a period of 30 months or more before being sold. During 1943 and 1944 petitioner advertised 7 of his houses for sale in the Detroit News and the Detroit Free Press. He began inserting these advertisements as early as July 1943. Each advertisement was inserted from one to ten times, so that a total of 32 insertions were run in advertising the sale of 7 houses. During 1944 and 1945 petitioner placed "For Sale" signs on a number of his houses. His telephone number was written on each sign. During the time that he rented the war housing units petitioner personally undertook the supervision and maintenance *13 of the property himself. In 1944, he found that his savings were gone and that he needed to raise cash with which to meet mortgage payments. Consequently, in 1944 he sold 11 houses. In the summer of 1944 petitioner decided to purchase a tract of land containing 46 residential lots. The sale was consummated in 1945 and in that year petitioner began construction of houses on the lots purchased. He built houses on 25 of the lots and sold them upon completion. The remainder of the lots were sold without improvement. In January 1945, petitioner decided to liquidate all of his rental properties and gave an open listing to a real estate broker to sell the houses as they became vacant. During 1945 and 1946, the broker placed a number of advertisements in Detroit newspapers advertising the sale of petitioner's war houses. With respect to the 88 houses sold by petitioner during the years in issue, the information relating to the number of houses completed in each year, the number of houses sold in each year, the number of houses sold to tenants, and the number of sales transactions may be summarized as follows: No. of
No. of
No. of
No. of
houses
houses
sales to
trans-
Year
completed
sold
tenants
actions
1942
9
1943
66
1944
13
11
3
11
1945
13
1
13
1946
62
10
62
1947
2
2
*14 On March 30, 1946, petitioner formed two corporations, "George H. Glover and Associates, Inc.," and "George H. Glover, Inc.," for the purpose of engaging in the construction and sale of residential property. On August 2, 1948, he formed a third corporation, "George H. Glover Construction Co., Inc.," likewise for the purpose of constructing and selling houses. On May 31, 1949, two of the corporations, George H. Glover and Associates, Inc., and George H. Glover Construction Co., Inc., were dissolved and merged with the third corporation, George H. Glover, Inc., which remains in existence. From the incorporation of George H. Glover and Associates, Inc., in March 1946 until its dissolution in May 1949 the gross sales of the corporation totaled $506,600. The receipts resulted entirely from the sale of houses constructed by the corporation. From March 1946 until March 31, 1950, gross sales of George H. Glover, Inc., totaled $1,061,332.56. These receipts likewise were received from the sale of houses built by the corporation. On the Federal income tax returns for 1944 filed separately by petitioners, the profits realized from the sales of houses were reported as ordinary income. In *15 Schedule C of each return the nature of the business from which the income was derived was stated to be "Real Estate." In the amended Federal income tax returns for 1944 filed separately by petitioners, on May 15, 1947, the profits realized from the sales of houses were reported as long-term capital gains. The nature of the business was there stated to be "Rental Property." On their joint Federal income tax return for 1945, the profits derived from the sale of real estate were reported by petitioners as ordinary income. On the face of the return petitioner stated his occupation to be "General Contractor, Builder." Opinion Respondent determined that gains realized by petitioners from the sales of houses during 1944, 1945, 1946, and 1947 are taxable as ordinary income under section 22(a) of the Internal Revenue Code of 1939. [1] Petitioner contends that such income is properly taxable as long-term capital gain pursuant to section 117(a)(1) and (j)(1) [2] of the 1939 Code. *16 The sole issue presented for our determination is whether at the time of sale petitioner held each parcel of real estate "primarily for sale to customers in the ordinary course of his trade or business" within the meaning of section 117(a)(1) and (j)(1), supra. In determining whether property is so held at the time of sale, the considerations to be given primary emphasis include the purpose for which the taxpayer is holding the property at the time of sale, the original purpose of the taxpayer in acquiring the property, the frequency, continuity and substantiality of sales, and the extent of sales activity on the part of the seller or his agents. Home Co. v. Commissioner, 212 Fed. (2d) 637; Dunlap v. Oldham Lumber Co., 178 Fed. (2d) 781; W. T. Thrift, Sr., 15 T.C. 366. In the years immediately prior to World War II petitioner worked as a real estate broker and, to a limited extent, he engaged in residential construction. During the period 1939 to 1942 petitioner constructed 14 houses, each of which was sold upon completion at a profit of from $600 to $800. During 1942 there developed a serious housing shortage in the Detroit area, and *17 petitioner's building activities were interrupted by wartime regulations. Petitioner decided to continue to construct housing under Government regulations which restricted the sale of houses and imposed ceilings on selling prices and rentals. He obtained priorities to construct a total of 90 houses. All of the houses sold during the years in issue were built under these priorities. Petitioner claims that he intended at all times to hold the houses in issue for rental purposes. In support of his contention, he calls to our attention the fact that the mortgage applications executed in 1942 in connection with the construction of the war housing contain the statement that his purpose in building was to rent the houses to be constructed. However, petitioner's activities, not only during the war years, but subsequent thereto, tend to militate against his position. None of the other houses built by petitioner either before or after the war were constructed for purposes of rental. He resumed construction of private housing in the fall of 1945, shortly after governmental restrictions were lifted, and continued actively to engage in residential construction thereafter. All of the houses *18 built subsequent to World War II were built for purposes of sale and were sold upon completion. Several of the houses built during 1943, pursuant to the wartime housing program, were advertised for sale upon completion and prior to being leased. Moreover, some of the houses completed and rented during the war years were leased with the understanding that the necessary approval of the Federal Housing Administration would be obtained so as to enable petitioner to sell the houses to the tenants. Further, we would not overlook the facts that under each rental agreement petitioner retained the right to enter the houses for the purpose of showing them to prospective purchasers, and that each house was rented on a month to month basis, both of which indicate an intent to keep the houses readily available for sale. Finally, the testimony of petitioner discloses that beginning in January 1945 he proceeded to sell the war housing units as they became vacant and that when the houses were vacated they were re-rented only if they could not be sold. Thus, petitioner's activities both during and after World War II appear to be completely inconsistent with his testimony that he intended at all times *19 to hold the war housing units solely for rental purposes. Strong evidence of his intention to engage in the real estate business during 1944 and 1945 is the statement of petitioner himself to that effect. In the Federal income tax returns for 1944 filed separately by petitioners on May 15, 1945, the profits realized from sales of houses were reported as ordinary income. In Schedule C of each of these returns the nature of business from which the income was derived was stated to be "Real Estate." On their joint Federal income tax return for 1945 petitioners again reported the profits realized from the sale of houses during that year as ordinary income. On the face of the return for 1945 petitioner stated his occupation to be "General Contractor, Builder." It was not until May 15, 1947, that any claim was made by petitioners that the profits derived from the sales of houses should be treated otherwise than as ordinary income. On that date they filed amended returns for 1944, in each of which the nature of business was stated to be "Rental Property." Accordingly, we are satisfied from the record that during the years in issue, when the houses in question were sold, petitioner's primary *20 intention was to hold them for sale to customers, rather than merely to liquidate an investment. Petitioner's conduct with respect to the houses here in issue indicates either that he intended to rent the houses for as long as he was required to do so and then sell them, or that he intended to pursue whichever of these activities, rental or sales, proved to be the more profitable. In Rollingwood Corporation v. Commissioner, 190 Fed. (2d) 263, a real estate broker had built 700 houses under the World War II housing program which he rented for an average period of 22 months and then sold over a period of 3 years. In ascertaining taxpayer's intention with respect to the houses, the court stated as follows at page 266: "Suppose the taxpayer in the instant case intended to rent the houses for as long as he was required to do so under existing regulations and then to sell them. Or suppose his intention was to pursue whichever of these activities proved to be the most profitable, that is, if the rental market were good he could continue to rent, but if the sales market were high he would sell. In either of these suppositions we think it is fair to say that one of the essential *21 purposes (in acquiring or holding the houses) is the purpose of sale. Under such circumstances, if the taxpayer does dispose of the houses by sale, is it within the legislative purpose to allow him to treat the proceeds of these sales as a capital gain? We think not." As noted above, during the period from 1939 to 1942, petitioner constructed and sold 14 houses, 4 of which were sold in 1942. Two houses were sold in 1943. During the four-year period commencing in 1943 and continuing through 1947 he sold a total of 88 houses involving 88 separate sales transactions. With respect to each of the years in issue, 11 houses were sold in 1944, 13 houses were sold in 1945, 62 sales were made in 1946 and 2 were made in 1947. From the foregoing, it is quite clear that the continuity of petitioner's housing sales was broken only by the restrictions imposed by wartime housing regulations during 1942 and 1943. Petitioner's sales activity during 1943, 1944, and 1945 previously has been discussed. We deem it sufficient to state here that during those years he conducted an active sales campaign which included extensive advertising, the employment of a real estate agent on a commission basis, the *22 active solicitation of both tenants and non-tenants as purchasers of houses, and most of the normal activities conducted by one engaged in the real estate business. In Home Co. v. Commissioner, supra, the taxpayer built 148 houses during 1942 and 1943 pursuant to the war housing program. In disposing of the property he conducted an active sales campaign, advertised extensively in the newspapers, contacted tenants in an effort to solicit purchasers, and listed the housing units with real estate brokers. In holding that the houses were sold in the ordinary course of the taxpayer's trade or business, the United States Court of Appeals for the Tenth Circuit stated as follows at page 641: "It carried on an active sales campaign, did extensive advertising, employed real estate agents, paid commissions, made sales through its own agents, actively solicited purchasers for the property, in fact, did everything one ordinarily does in carrying on such a business. "One may, of course, liquidate a capital asset. To do so it is necessary to sell. The sale may be conducted in the most advantageous manner to the seller and he will not lose the benefits of the capital gain provision *23 of the statute, unless he enters the real estate business and carries on the sale in the manner in which such a business is ordinarily conducted. In that event, the liquidation constitutes a business and a sale in the ordinary course of such a business and the preferred tax status is lost." In our opinion, petitioner's activities are essentially indistinguishable from those engaged in by the taxpayer in Home Co. v. Commissioner, supra. Petitioner's apparent intention ultimately to dispose of the houses constructed, together with his continuous activities in the construction and sale of houses over a period of several years, his open and active endeavors to solicit purchasers and market the property and the frequency of the sales during the years in issue compel us to conclude that he had established himself in the business of selling real estate and that the houses sold during 1944, 1945, 1946, and 1947 were, at the time of sale, held primarily for sale to customers in the ordinary course of that business. We therefore hold that the profits realized by petitioner from the sale of property during the years in issue must be treated as ordinary income taxable under section *24 22(a) of the 1939 Code. Decisions will be entered for the respondent. Footnotes
1. SEC. 22. GROSS INCOME. (a) General Definition. - "Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form paid, or from professions, vocations, trades, business, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * * ↩
2. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business: * * *
(j) Gains and Losses from Involuntary Conversion and from the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of Property Used in the Trade or Business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *↩