W. T. THRIFT, SR., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

LUCILLE B. THRIFT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 24105, 24106. Promulgated September 29, 1950.

*W. M. Aikman, Esq.*, for the petitioners.
*F. S. Gettle, Esq.*, for the respondent.

368

**OPINION.**

ARUNDELL, *Judge:* Whether property at the time of sale constitutes a capital asset held by the taxpayer as an investment or property held primarily for sale to customers in the ordinary course of his trade or business is wholly a question of fact.   However, in the course of deciding the many cases posing this question, the Courts have adopted a number of well recognized tests.   The governing considerations have been the purpose or reason for the taxpayer's acquisition of the property and in disposing of it, the continuity of sales or sales related activity over a period of time; the number, frequency, and substantiality of sales, and the extent to which the owner or his agents engaged in sales activities by developing or improving the property, soliciting customers, and advertising. *Boomhower* v. *United States,* 74 F. Supp. 997.   No one of these tests can be regarded as determinative but the question must be viewed in the light of all pertinent factors and particularly the facts of the individual case.

The petitioner's conduct prior to the year 1946 clearly establishes that he acquired the property as an investment and was not engaged in the business of buying and selling real estate. From 1929 until the time of the hearing and at the time he purchased the tract in question, petitioner was the president and majority stockholder of the Thrift Lumber Co. and devoted all of his time to that business. He has testified that throughout his active business career he has been a party to approximately ten real estate transactions.

Although petitioner apparently would have been willing at any time to sell the land at a profit, until 1946 he passively held title to the tract in its unimproved state and made no effort to solicit offers or to improve or subdivide the property. In 1944 and 1945 when petitioner was approached by the representatives of several prospective buyers, he affixed a price for the whole tract but no sales were made.

These facts narrow the question to whether petitioner's activities in connection with the property following his initial negotiations with a group of home builders in June or July 1945 were sufficient to establish him in the real estate business and thereby convert the asset he had originally purchased and held until that time as an investment into property held primarily for sale to customers in the ordinary course of his trade or business.

In our opinion, the record clearly establishes that petitioner undertook to subdivide the tract, improve the streets, and install the water and sewer systems only because the builders were financially unable to provide for the installation of these facilities. It may be true, as respondent argues, that petitioner's informal oral agreement with the builders would have been unenforceable at law had either the petitioner or the builders refused to perform. However, this fact is of no importance as we are convinced that petitioner was relying upon the good faith of the promises made by the builders when he contracted for the needed improvements and there is no need for us to speculate as to the enforceability of the agreement as the record demonstrates that it was executed in accordance with the original understanding of the parties.

We do not mean to infer that a taxpayer's intentions in improving and subdividing property may be divorced from his later activities and be regarded as a determinative factor. It may well be that the number, continuity, and substantiality of subsequent sales and sales related activity over a period of time may be so extensive as to establish him in the real estate business regardless of his original intention. However, we do believe that his later activities should be tested to determine whether or not they were consistent with his stated purpose.

In our opinion the petitioner's activities subsequent to the subdividing of the tract and the installation of water and sewer facilities did not come within the concept of "business", for that term as used

in the statute, "notwithstanding disguise in spelling and pronunciation, means busyness; it implies that one is kept more or less busy, that the activity is an occupation." *Snell* v. *Commissioner*, 97 Fed. (2d) 891; *Dunlap* v. *Oldham Lumber Co.*, 178 Fed. (2d) 781. The statute further requires that the property must not only have been "held primarily for sale" but also for sale in the "ordinary course of the business of the taxpayer." *Dunlap* v. *Oldham Lumber Co.*, *supra*. Section 117 (a) (1) of the Internal Revenue Code.

During the taxable year petitioner made no effort to sell lots to the general public and refused to make sales to individual purchasers. The lots were never advertised or listed with a real estate agent and no signs were erected on the property to solicit offers. Nor is there any evidence that petitioner was engaged in the business of selling lots to home builders or contractors generally. Petitioner's sales were made to the same builders with whom he originally negotiated, with the exception of one builder who withdrew and was replaced thereafter by another builder who was taken into the project at his own request, and the petitioner's son, for whom one block of lots had been reserved under the original agreement for his use upon his release from the armed forces.

Nor can we fairly regard the sales of lots made by the petitioner to six purchasers as 152 separate transactions, for it is clear that all sales were made pursuant to the general understanding that each builder would take the block of lots assigned to him under the original agreement. In the case of the petitioner's son an entire block of 24 lots was conveyed in one transaction and although it cannot be determined from the record exactly how many separate deeds were required to convey the other 127 lots to the five other home builders, it is clear that the same procedure of block sales was employed.

We feel that the number, continuity, and frequency of sales viewed in the light of the original understanding between the petitioner and the builders and the manner in which it was executed shows that the substance of the transaction here in issue was that petitioner improved and developed the property he had purchased and retained as an investment not with the intention of selling lots to the public or to building contractors generally, but solely for the purpose of facilitating the disposition of all or a large part of the property to a specific and limited group of builders with whom he had already reached an understanding. In our opinion the record shows that the petitioner did not thereafter extend his activities in respect to the property beyond those measures necessary to accomplish this purpose and in our judgment his course of conduct did not establish any ordinary course of business as to the sale of lots such as is required to convert the property from the character of a capital asset held for investment purposes to prop-

erty held for sale in the ordinary course of the taxpayer's trade or business.

It follows that the respondent erred in determining that the gain realized by the petitioners from the sale of the 152 lots in question during 1946 was taxable to the petitioners as ordinary income rather than capital gain.

The remaining question is whether the gain on the 24 lots sold to W. T. Thrift, Jr., in 1946 is to be regarded as having been reported by the petitioners on their 1946 returns under the so-called installment basis. Petitioners do not dispute the correctness of the respondent's computation of the gain realized from the sale of the 24 lots or its inclusion in their 1946 income on the completed contract basis on any ground other than their contention that they intended to report the gain under the installment method provided by section 44 of the Internal Revenue Code,[1] and that their 1946 returns did, in fact, disclose such an election.

The parties have stipulated that petitioners, in their 1946 returns, reported the sale of 4 lots to W. T. Thrift, Jr., showing a gross sales price of $4,654, cost of $2,008, and a profit of $2,646. These figures include the sales price of $1,420 paid in full by Thrift, Jr., in 1946 for 1 lot which had a reported cost of $568, which was not sold under the general warranty deed arrangement, and the purchase price of 3 other lots on which $18 per foot had been paid and a release given under the provisions of the general warranty deed.

The petitioners' returns did not contain any indication whatsoever of an intention to claim the benefit of reporting the total gain from the sale of the 24 lots to their son under the installment basis. The returns made no mention that 21 lots, in addition to the 3 reported, had been sold to their son in 1946 under the general warranty deed arrangement nor did they contain any of the other information necessary to a computation of the gain under the installment basis. The gain disclosed on the returns was described as that realized from the sale of the

---

[1] SEC. 44. INSTALLMENT BASIS.

(a) DEALERS IN PERSONAL PROPERTY.—Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed, bears to the total contract price.

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—In the case * * * of a sale or other disposition of real property, if in either case the initial payments do not exceed 30 per centum of the selling price (or, in the case sale or other disposition was in a taxable year beginning prior to January 1, 1934, the percentage of the selling price prescribed in the law applicable to such year), the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. As used in this section the term "initial payments" means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.

4 lots described above which had been bought and paid for by the son during 1946, which indicates to us, as it must have to the Commissioner, that the petitioners were electing to report on a completed contract basis.

Petitioners attempt to support their argument by pointing out that the money received from their son in 1946 for 3 of the 24 lots was less than 30 per cent of the selling price of all 24 lots and that the gain of $1,790.41, which was actually reported was almost equal to the amount of $1,757.17 which they would have been required to report if their gain had been computed under the formula prescribed by section 44. But we can attach no importance to these facts when it appears that they result from mere coincidence and not from some clear expression on the face of the petitioners' returns to show that they intended to report the gain on the installment rather than the completed contract basis. Moreover, petitioners' position would require a finding that some part of the payments received by the petitioners from their son in 1946 constituted "initial payments" on the whole block of 24 lots when the petitioners' returns indicate otherwise.

Although we cannot account for the petitioners' failure to disclose the sale of the remaining 21 lots on their 1946 returns, we do not accept the suggestion that this omission is evidence of an election to report the gain from all 24 lots on the installment basis, for a disclosure of all relevant information concerning the sale of the other 21 lots would have been necessary to show such an election. Thus, it is clear that the petitioners made no election at all in respect to the gain realized from the sale of the other 21 lots. Having accepted a demand promissory note from the son for the full purchase price of all 24 lots at the time of the conveyance, the fair market value of the note was includible in the petitioners' gross income for 1946 unless they made an election and qualified under the installment provisions of section 44. As no election to report the gain on the installment basis was made, and the petitioners have not shown that the fair market value of the note was less than its face value, we are of the opinion that the respondent correctly determined that the gain realized from the sale of all 24 lots was properly includible in petitioners' income for 1946.

Nor may the petitioners now claim that they are entitled to the benefits of section 44. The opinion of this Court in *Sarah Briarly*, 29 B. T. A. 256, is expressive of the established rule, wherein it states that when benefits are sought by taxpayers, meticulous compliance with all the named conditions of the statute is required, and that in the case of section 44, timely and affirmative action is required on the part of those seeking the advantages of reporting upon the installment basis. We feel that it is now too late for the petitioners to claim the benefits of section 44. Cf. *Morgan Rundel*, 21 B. T. A. 1019; *Liberty*

*Realty Corp.*, 26 B. T. A. 1119; *Sylvia S. Strauss*, 33 B. T. A. 855, affd., 87 Fed. (2d) 1018; *Pacific Nat. Co.* v. *Welch*, 304 U. S. 191; *United States* v. *Kaplan*, 304 U. S. 195.

In order that the petitioners' tax liability for 1946 may be recomputed in accordance with the conclusions reached herein,

*Decisions will be entered under Rule 50.*