CHARLES E. REITHMEYER AND GRACE M. REITHMEYER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

WILLY D. GRUSHOLT AND MARTHA W. GRUSHOLT, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 55861, 55862. Filed July 11, 1956.

*Randolph E. Paul, Esq.*, and *Julian N. Stern, Esq.*, for the petitioners.

*Thomas N. Chambers, Esq.*, for the respondent.

OPINION.

MULRONEY, *Judge:* Petitioners' first point, with regard to the land sales, is that the properties sold were not held by them primarily for sale to customers in the ordinary course of their trade or business, and therefore, under section 117 (a) (1) and section 117 (j) (1), Internal Revenue Code of 1939, the sales they made were entitled to capital gains treatment. Respondent determined the gain on the sale of realty in 1950 and 1951 to be ordinary income from property held primarily for sale to customers in the ordinary course of petitioners' trade or business.

Whether or not real property is held primarily for sale to customers in the ordinary course of the owner's trade or business is a question of fact. It appears to be one of the most frequently litigated questions under the Internal Revenue Code. Many opinions on this question have stated the relevant factors that should be considered. Thus in *W. T. Thrift, Sr.,* 15 T. C. 366, 369, we said:

The governing considerations have been the purpose or reason for the taxpayer's acquisition of the property and in disposing of it, the continuity of sales or sales related activity over a period of time; the number, frequency, and substantiality of sales, and the extent to which the owner or his agents engaged in sales activi-

ties by developing or improving the property, soliciting customers, and advertising. *Boomhower* v. *United States,* 74 F. Supp. 997. No one of these tests can be regarded as determinative but the question must be viewed in the light of all pertinent factors and particularly the facts of the individual case.

See also *Camp* v. *Murray*, (C. A. 4) 226 F. 2d 931; *Smith* v. *Dunn*, (C. A. 5) 224 F. 2d 353; *Martin Dressen*, 17 T. C. 1443; *D. L. Phillips*, 24 T. C. 435.

Petitioners formed their partnership in 1943 for the purpose of engaging in the general business of mining and selling sand and gravel. Petitioners could only engage in that business after making some arrangement to acquire sand and gravel. There would seem to be but two ways to acquire the product the business was to sell—either buy the right to mine it or buy land containing sand and gravel deposits. Petitioners started business by buying the right to mine sand and gravel in the Dal Maso Pit on a royalty basis of 15 cents a cubic yard. Later on petitioners ran a number of test holes to see how much sand and gravel was in this Dal Maso land. The tests showed about 100,000 cubic yards and petitioners decided to buy the land outright, as the asking price for the land would reduce the cost of sand and gravel to around 10 cents per cubic yard. When Reithmeyer was interrogated as to why they purchased the Dal Maso Pit in January of 1944, he said:

> We estimated the quantity of gravel available in the pit as against what we were paying for it and then figured that their asking price would buy the gravel for us cheaper if we bought the land than if we continued to take it on a royalty basis.

There were other advantages to buying the pit, such as flexibility of operation that enabled them to dig wherever they wanted to in order to meet certain job specifications. Reithmeyer explained that there are various types of sand and gravel in separate veins in gravel deposit land. Petitioners' sand and gravel business went on after they bought the Dal Maso Pit in the same manner as before except now their sand and gravel cost them less per cubic yard. There was no change after they bought the adjacent Pit No. 1 from Fee about 7 months later. This was bought in the same manner, after test holes showed about 500,000 cubic yards of gravel and the asking price of the land would make the gravel cost around 8 cents a cubic yard.

There was evidence that Grusholt had, before the days of the partnership, paid from 20 to 40 cents a yard royalty for mining sand and gravel on this property. Again with respect to this purchase Reithmeyer said:

> when we estimated the quantity of gravel remaining as against the asking price of Mr. Fee, it was just a matter of economics; we could buy the gravel cheaper by buying the land.

We feel it is firmly established that the Dal Maso Pit and Pit No. 1 were acquired by petitioners for the purpose of acquiring sand and gravel for their sand and gravel business. The purchases of the two tracts were really no more than the purchase of so much sand and gravel in the ground. In a way, respondent seems to recognize this for, as will later appear, when respondent computed petitioners' depletion he used the full purchase price of the land as the recoverable cost for petitioners' sand and gravel business. The purchases of land were made during the war years, and after the war the land acquired tremendous value for rural building sites but there is nothing in the record to indicate the building site value of the land was considered by petitioners at the time of purchase.

The business use of the land was an exhaustive one, insofar as petitioners' sand and gravel business was concerned. As the mining operation progressed it would leave the ground, which would be of no use to the sand and gravel business, though obviously it would have some value to the owners. The two parcels of land were portions of farmland, the land being rolling and somewhat wooded. After the mining operation the land had no further value as farmland. But after the mining the land was fairly flat and apparently suitable for housing sites with some desirable location features in that it was within reasonable commuting distance of Washington, D. C.

In July of 1946 a builder named Nils Karlsson, who was seeking building sites, came to petitioners and they sold him 15½ acres of mined-out land from the Dal Maso Pit for $600 an acre. The conveyance contained certain restrictions, amongst them being a stipulation restricting the use of the premises for residential purposes and providing no dwelling shall be erected on said premises at a cost of less than $4,500.

Later in 1946 petitioners subdivided a portion of this mined-out land into lots. Petitioners then formed the North Forestville Development Company, in which they were equal partners, and, beginning in 1946, they built and sold 24 houses on lots in this subdivision. The record does not show the terminal date of the house-building and sales activity, except to show they built no more houses on this subdivision after 1951. In passing, we will state petitioners reported their profit received on the sale of houses they built as ordinary income. In 1947 petitioners sold 6 of the lots in this subdivision without putting any houses on them. The sales were to 4 builders who came to petitioners seeking lots on which to build houses. Petitioners made no effort to sell these vacant lots. In 1948 petitioners sold 6 more vacant lots from this subdivision in 1 sale to a builder under the same circumstances.

This brings us down to the sales made in 1950 and 1951. On May 29, 1950, petitioners sold 18.61 acres from Pit No. 1 and 4 acres from the Dal Maso property, which acreage made a total of 80 building lots, to the Boswell-Miller Construction Company at a price of $950 per lot, or a total purchase price of $76,000.

Boswell-Miller Construction Company exercised its option under the May 29, 1950, contract in 1951, on an additional 7.27 acres from Pit No. 1, which acreage made 32 building lots, for a total purchase price of $30,400.

The second sale in question is the sale in 1951 of slightly more than 1 acre from Gravel Pit 1A for $6,480. Forestville bought this pit in February 1951 for $44,600. This 1 acre of the pit which was sold did not contain any gravel. It seems to have been 1 acre out of a large pit where the tests showed it was all clay. The acre was sold to a builder named Horace L. Allen and here again, the sale resulted from an unsolicited offer by the buyer.

During the year 1951 petitioners made 3 sales of building lots included in the subdivision of the North Forestville Development Company. These sales were as follows: Nils G. Karlsson, 3 lots, $2,900; Grover C. Robey, Jr., 4 lots, $4,200, of which sum, $1,200 was received in 1951; and G. E. Royalty, 6 lots, $7,200, of which amount, $4,415.91 was received in 1951. As pointed out earlier, this subdivision comprised portions of the Dal Maso Pit and Pit No. 1. Purchasers were all builders who were in the business of building houses on lots for sale. The sales resulted from unsolicited offers by the purchasers.

The test which deserves the greatest weight is the purpose for which the property was held during the years in question. *D. L. Phillips, supra.* For what purpose was the property, that was ultimately sold, held by petitioners? Obviously, it was first held by petitioners for the purpose for which it was acquired, namely, for use in petitioners' sand and gravel business. Clearly, it was not held by petitioners for sale to customers in the ordinary course of petitioners' trade or business before the sand and gravel were mined out of it. For what purpose was it held after the mining operation? It was not being held for farming. We think the land was then being held by petitioners for sale. But it was a holding for sale in the sense of disposal of an asset no longer of use to petitioners in their business, and not a holding primarily for sale to customers in the ordinary course of petitioners' business. Such a holding to liquidate an asset no longer useful would not preclude capital gains treatment under section 117 (j) but it is also true petitioners could enter the real estate business in order to dispose of some or all of this mined-out land and as to such sales, the benefits of section 117 (j) would be lost. *Curtis Co.*, 23 T. C. 740. We are of the opinion that petitioners pursued both methods of disposal.

They were holding all of the mined-out land for a disposal or liquidation sale. When they formed the company known as the North Forestville Development Company, and through this company platted a portion of the mined-out area into a subdivision and built and sold houses and vacant lots in the subdivision, we think, as to this area, the petitioners had decided it would be more expeditious to enter the real estate business in order to dispose of this land. We feel petitioners were holding these lots in the subdivision for sale, with or without houses built thereon. The record shows that up to and including 1951, petitioners actually sold 25 vacant lots from this subdivision, and they admit selling 24 lots with houses thereon. The fact that the sales of the vacant lots were to builders is not too important and the fact that petitioners did not engage in sales activity to sell vacant lots is not a determining factor. The fact is, as to the platted area, petitioners held all of the lots for sale to customers. The obvious reason for the platting and subdividing was to attract buyers. To say they only intended to attract buyers, and sell the lots after they had built houses thereon, is unrealistic in the light of this record showing they sold more vacant lots from the area than improved ones. We hold as to the sales of lots from the platted area by the petitioners through their company known as the North Forestville Development Company, petitioners were making sales of property held primarily for sale to customers in the ordinary course of their business and such sales were not entitled to capital gains treatment.

The sales to Boswell-Miller Construction Company in 1950 and 1951 were sales of raw, mined-out land. They were actually one sale, for the 1951 sale was merely the exercise of an option granted under the sale contract of May 29, 1950. It is stipulated the 1950 sale was 18.61 acres and the 1951 sale was 7.27 acres. The original contract of May 29, 1950, and subsequent amendments provided the seller would clear and level the property covered by the contract, and subdivide the property into lots with a frontage of 55 feet and depth of 110 feet, and construct other improvements in the area in the nature of streets and sewers. We hold the sales to Boswell-Miller Construction Company in 1950 and 1951 were not sales of property held by petitioners primarily for sale to customers in the ordinary course of their business. They were not unlike the first sale made in 1946 to Nils Karlsson of 15½ acres of mined-out land for $600 an acre. It is true that here the petitioners agreed to clear and level the land and to plat and subdivide the property into lots and construct streets and gutters and final settlement or payment of the purchase price was to be deferred until that was done, but the fact remains, at the time of sale the land was merely raw, mined-out land. At that time it cannot be said the land was being held for sale to customers in the ordinary

course of their business. The development of this area, unlike the development of the area previously discussed, followed the sale. There was no sales activity carried on by petitioners with respect to this property. The real estate agent who handled the Boswell-Miller Construction Company sale, and who testified as respondent's witness, said he became independently interested in this land and the possibility of selling it for the owners. He first approached Boswell-Miller and convinced them that they should buy the property and he then went to petitioners and persuaded them, after considerable difficulty, to sell. In his words, "It was hard to get them to sell." The property was not listed with any real estate agent and the agent who made the sale said he did not know the petitioners prior to his going to see them about their selling the land to Boswell-Miller Construction Company.

Eliminating the sales of the lots in the subdivision, which we hold were sales to customers in the regular course of petitioners' business, there was only one other sale of raw, mined-out land, prior to the Boswell-Miller sale in 1950. That was the sale to Nils Karlsson, some 5 years earlier, of 15½ acres. As stated, the second sale to Boswell-Miller in 1951 was the exercise of the option granted under the first sale contract. This does not show the degree of freqency and continuity which usually evidences the carrying on of a real estate business.

In the sale of the acre of land to Allen in 1951 from Gravel Pit 1A, the petitioners were, we feel, disposing of a capital asset. This land was about the same as mined-out land. It was 1 acre of a large pit that contained no sand and gravel. The tests showed it was all clay. It was not bought for resale. The record shows it was sold without any sales activity on petitioners' part and it was sold *because* it was unusable for petitioners' sand and gravel business. As such, it was entitled to capital gains treatment. *Carter-Colton Cigar Co.*, 9 T. C. 219; *Alamo Broadcasting Co.*, 15 T. C. 534.

Petitioners cite as authority for their position other cases such as those where livestock was obtained and used for breeding purposes and later sold when no longer useful for the original breeding purpose. *Albright* v. *United States*, (C. A. 8) 173 F. 2d 339; *Fawn Lake Ranch Co.*, 12 T. C. 1139. We feel such cases are in point with reference to the Boswell-Miller sale and support petitioners here. We see no clear dissimilarity in those cases and the said sale in the instant case, except in the kind of property dealt in, to warrant a capital gains treatment in one and not the other.

Petitioners make some argument that their method of recovering the cost of gravel sold should not be disturbed. The argument is that their method of using the total payments made each year on the purchase price of the gravel pits, as payments for cost of gravel, will never result in their obtaining more than actual cost. Section 23 (m), In-

ternal Revenue Code of 1939, provides for a depletion allowance on a unit basis. The method or formula is stated in Regulations 111, section 29.23 (m)–2, to be the adjusted basis divided by the number of units of mineral remaining as of the taxable year multiplied by the number of units of mineral sold within the taxable year. Respondent used this method and petitioners do not argue that this was error.

Petitioners' chief complaint is not respondent's use of the formula but respondent's determination of adjusted basis for application of the formula. In the first place, petitioners argue if their method of recovering cost was incorrect then it was not a proper method at all and simply resulted in erroneous deductions having no effect on basis. The adjusted basis means the proper adjustment for "depletion, to the extent allowed (but not less than the amount allowable)." Sec. 113 (b) (1) (B), I. R. C. 1939. Petitioners' method of using the deferred payments on purchase price as their method of depletion allowance was wrong but nevertheless, to the extent allowed, their method worked a reduction of basis. The adjustment required for any taxable year is the amount allowed or the amount allowable for such year whichever is greater. Respondent's reduction of basis by the greater of depletion allowed or allowable was in accordance with section 113 (b) (1) (B), Internal Revenue Code of 1939, and Regulations 111, section 29.113 (b) (1)–1.

Petitioners assert respondent erred in his computation, in that he made a reduction of basis for capital recoveries on lot sales from the Dal Maso and Fee tracts in 1947 and 1948. As shown in the Findings of Fact, the stipulation shows a basis claimed for 12 vacant lot sales in 1947–1948 of $3,600, while the respondent in his computation determined the total cost of land sold in these years was $10,400. These lots were all in the Dal Maso and Fee property. We do not know the exact basis for the Commissioner's figures here. But the stipulation also shows other sales of lots with houses thereon from the same area during the same years with no evidence as to sales price. In any event, respondent's computation is presumptively correct and petitioners have failed in their burden to show it was wrong.

Respondent admits a minor error, i. e., the inclusion of 1943 royalty yardage in his computation. Petitioners did not own any gravel pits in 1943. This would only amount to an adjustment of $972.40 and makes no difference in the result.

Petitioners complain over respondent's combining of Dal Maso and Fee property as a single depletable property though admitting this "makes little difference mathematically." Respondent concedes they should be treated separately, but points to some of petitioners' records which were exhibits, where the two properties were treated as one. Without some showing that separate computations for each property will change the result, we need not change it. It is to be

noted respondent's computation on an allowed or allowable basis shows a capital recovery of $52,372.39 by the end of 1949 compared to a capital investment to recover the purchase price of the Dal Maso and Fee property of $50,000.

We hold respondent was right in his computation of depletion on the unit cost basis as provided by the statutes and petitioners have failed to show respondent's computation was incorrect.

Petitioners are not entitled to any deduction or amortization for the cost of the road purchased from Ralph A. Gray, Sr. They bought the fee. They still own it. They pay taxes on it. It has not been abandoned. In fact, it is still being used as a roadway by a lot owner who apparently has some "interest" in it. How the lot owner acquired an interest in it is not shown.

*Decisions will be entered under Rule 50.*