ESTATE OF LUKE J. BARRIOS, DECEASED, AND SALLIE F. BARRIOS, SURVIVING WIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 58314. Filed November 29, 1957.

*Sidney W. Provensal, Jr., Esq.*, for the petitioners.
*Jackson L. Bailey, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in the petitioners' income tax and additions to tax as follows:

| Year | Deficiency | Additions to tax under sec. 294 (d) (2) |
|---|---|---|
| 1951 | $13,446.78 | ---------- |
| 1952 | 8,077.64 | $520.27 |
| 1953 | 4,333.36 | 208.02 |

The issues are (1) whether the gain realized from the sale of real estate in the years 1951, 1952, and 1953 is taxable as ordinary income or as capital gains; and (2) whether petitioners are liable for additions to tax in the years 1952 and 1953 under section 294 (d) (2) of the Internal Revenue Code of 1939 for substantial underestimates of the estimated tax.

FINDINGS OF FACT.

Some of the facts are stipulated and are hereby found as stipulated.

Sallie F. Barrios, hereinafter referred to as petitioner, and Luke J. Barrios, deceased, were husband and wife during the years here involved. They filed a joint income tax return for the year 1951 with the then collector of internal revenue for the district of Louisiana at New Orleans, Louisiana, and joint income tax returns for the years 1952 and 1953 with the district director of internal revenue for the district of Louisiana at New Orleans, Louisiana. Luke J. Barrios died in March 1953, and the return for 1953 was filed by petitioner, as surviving spouse, in the name of her husband and herself.

Petitioner and her husband reported income for the years 1949 through 1953 as follows:

| Year | Veterinary practice | Interest [1] | Net gain from sale of capital assets |
|---|---|---|---|
| 1949 | ($184.80) | | $1,675.00 |
| 1950 | (592.70) | $701.20 | 4,188.11 |
| 1951 | | 1,219.11 | 19,220.89 |
| 1952 | | 797.85 | 14,569.39 |
| 1953 | | 336.91 | 7,739.96 |

[1] From installment sales of property.

Luke J. Barrios was a doctor of veterinary medicine and was in active practice until the year 1951 when he became sick and unable to practice thereafter.

Petitioner had held a license to sell real estate in 1923 and 1924 when she was an employee of the People's Investment Security Company. This company was liquidating some plantation property and the secretary of the association secured a license for her so she could go with him and aid in the sales of the property which had been divided up into tracts. She worked with the secretary for about 2 months and sold two tracts. Petitioner held no real estate broker's license after the year 1924 and her husband was never licensed as a real estate agent or broker.

In the years 1923 to 1926 petitioner and her deceased husband purchased, in community, a total of 165.2 acres of real estate, which was part of a former plantation known as Crescent Plantation, located on Bayou Black near the town of Houma, Louisiana. The land was purchased for the purpose of raising sugar cane and was under active cultivation until the year 1936. In 1936 the completion of the Intercoastal Canal south of the property affected the drainage facilities and after 1936 no further farming was done on

the property. In 1936 Luke J. Barrios transferred all his right, title, and interest in the property to petitioner, in settlement of an obligation to petitioner for the use of her separate and paraphernal funds during their marriage. In the same year petitioner sold a part of the property in two separate sales.

On May 1 and June 16, 1951, petitioner purchased two additional tracts of land in the Crescent Plantation property for a total consideration of $4,200. During the years 1939 to 1950, the petitioner subdivided a part of the property owned by her. The subdivision was designated Barrios Subdivision No. 1. The following plat and addenda were filed by petitioner:

| | Date filed | No. of lots |
|---|---|---|
| Original plat | Apr. 11, 1939 | 7 |
| Addendum No. 1 | July 12, 1939 | 4 |
| No. 2 | Apr. 26, 1940 | 13 |
| No. 3 | Jan. 12, 1949 | 3 |
| No. 4 | Dec. 8, 1949 | 7 |
| No. 5 | Feb. 6, 1950 | 14 |
| No. 6 | May 18, 1950 | 40 |

Petitioner in 1946 subdivided additional property which was designated Barrios Subdivision No. 2, comprised of 16 lots. In 1950 petitioner subdivided additional property which was designated as Barrios Subdivision No. 3, comprised of 17 lots. Petitioner in 1950 subdivided further property designated as Barrios Subdivision No. 4, comprised of 177 lots. The plat for Subdivision No. 4 was filed on January 13, 1951. Addendum No. 1 was filed January 25, 1954, showing two blocks consisting of 14 lots. This addendum was comprised of the two purchases of property by petitioner on May 1 and June 16, 1951. On April 23, 1940, the petitioner purchased for $977.50 a strip of land 50 feet in width that passed through her property. This strip had formerly been used as a right-of-way for a railroad.

During the years 1949 through 1953, Barrios Subdivision Nos. 1, 2, 3, and 4 were surveyed and landscaped, and water mains, streets, and culverts were installed. The cost of these developments and subdividing was as follows:

| Year | Amount |
|---|---|
| 1949 | $1,500.00 |
| 1950 | 17,150.48 |
| 1951 | 46,272.77 |
| 1952 | 25,516.29 |
| 1953 | 6,410.70 |

Petitioner, in the years 1939 to 1948, inclusive, made total sales of 30 lots from Barrios Subdivision Nos. 1 and 2. In the years 1949 through 1953, sales were made of 233 lots from Barrios Subdivision Nos. 1, 2, 3, and 4 as follows:

| Year | No. of lots sold | No. of sales |
|---|---|---|
| 1949 | 7 | 5 |
| 1950 | 58½ | 37 |
| 1951 | 94 | 44 |
| 1952 | 38½ | 22 |
| 1953 | 35 | 22 |

The lots were sold both for cash and on the installment basis.

Petitioner's inventory of lots, additions, sales, total selling prices, and profit during the years 1949 to 1953 in Barrios Subdivision Nos. 1, 2, 3, and 4 were as follows:

| Year | Inventory of lots Jan. 1 | No. of lots added | No. of lots sold | Total selling price | Gross profit | Net profit from sale of lots |
|---|---|---|---|---|---|---|
| 1949 | 10 | 10 | 7 | $6, 850 | | |
| 1950 | 13 | 71 | 58½ | 53, 600 | $15, 823 32 | |
| 1951 | 25½ | 177 | 94 | 87, 950 | 49, 056. 60 | $45, 434. 60 |
| 1952 | 108½ | | 38½ | 42, 700 | 36, 846. 68 | 32, 288. 46 |
| 1953 | 70 | | 35 | 36, 825 | 25, 169. 03 | 20, 143. 92 |

In connection with the sale of lots from the subdivisions, all sales were handled by petitioner personally in her home. Petitioner did not demonstrate any lots to prospective purchasers. She arranged all details in connection with the conveyances and when installment sales were made, held the mortgage notes and made installment collections. Petitioner also managed and supervised all development activities. Petitioner did not employ any real estate agent or other salesman to handle the sale of the lots. No advertising was ever done and there was no real estate listing for petitioner in the telephone directory. All acts of sale in connection with these lots were completed in the office of the same attorney.

There was a strong demand for homesites in the vicinity of Houma, Louisiana, during the years here involved. Petitioner's land was ideally situated for this purpose and was readily salable.

The lots sold by petitioner during the years 1951, 1952, and 1953 were held primarily for sale to customers in the ordinary course of petitioner's trade or business.

### OPINION.

Respondent contends that the lots sold by petitioner in the years 1951, 1952, and 1953 were held primarily for sale to customers in the ordinary course of her trade or business, and that the gain realized is ordinary income. Sec. 117 (a) and (j), I. R. C. 1939. Petitioner contends that the sales were in liquidation of capital assets within the meaning of section 117 (a), and that capital gain resulted.

We agree with the respondent.

The issue is one of fact, *D. L. Phillips*, 24 T. C. 435 (1955), and there is no one determinative test. The many cases that turn on this issue have set forth certain factors to be considered. *C. E. Mauldin*, 16 T. C. 698 (1951), affd. 195 F. 2d 714 (C. A. 10, 1952). But each case rests on its own facts and in most instances it is unlikely that all the factors will be applicable or of the same weight that they might have in another factual background. See *C. E. Mauldin*, *supra*. *Gamble* v. *Commissioner*, 242 F. 2d 586 (C. A. 5, 1957), affirming T. C. Memo. 1955–289; *Consolidated Naval Stores Co.* v. *Fahs*, 227 F. 2d 923 (C. A. 5, 1955); *Smith* v. *Commissioner*, 232 F. 2d 142 (C. A. 5, 1956), reversing T. C. Memo. 1955–35. These factors were enumerated in *W. T. Thrift, Sr.*, 15 T. C. 366, 369 (1950):

The governing considerations have been the purpose or reason for the taxpayer's acquisition of the property and in disposing of it, the continuity of sales or sales related activity over a period of time; the number, frequency, and substantiality of sales, and the extent to which the owner or his agents engaged in sales activities by developing or improving the property, soliciting customers, and advertising. * * *

Petitioner argues that she was engaged in the liquidation of the plantation originally purchased in the years 1923 to 1926 and used for approximately 10 years for the cultivation of sugar cane. It is true that one may liquidate an asset in the most advantageous way and still obtain capital gains treatment, but the question is whether in liquidating one entered a business; whether he entered a business to liquidate or to make money is not controlling. *Ehrman* v. *Commissioner*, 120 F. 2d 607 (C. A. 9, 1941), affirming 41 B. T. A. 652 (1940), certiorari denied 314 U. S. 668 (1941). As was said in *Galena Oaks Corporation* v. *Scofield*, 218 F. 2d 217, 220 (C. A. 5, 1954):

One may, of course, liquidate a capital asset. To do so it is necessary to sell. The sale may be conducted in the most advantageous manner to the seller and he will not lose the benefits of the capital gain provisions of the statute, unless he enters the real estate business and carries on the sale in the manner in which such a business is ordinarily conducted. In that event, the liquidation constitutes a business and a sale in the ordinary course of such a business and the preferred tax status is lost.

The fact of liquidation, then, is not to be disregarded but is not of great weight when accompanied by active elements of development and sales activity. *Milton S. Yunker*, 26 T. C. 161 (1956), on appeal (C. A. 6, 1956). Likewise the purpose of acquisition is a factor to be considered, *Goldberg* v. *Commissioner*, 223 F. 2d 709 (C. A. 5, 1955), reversing and remanding 22 T. C. 533 (1954), but it is not controlling, and the ultimate question is for what purpose was the property *held*. *Richards* v. *Commissioner*, 81 F. 2d 369 (C. A. 9, 1936), affirming 30 B. T. A. 1131 (1934); *C. E. Mauldin*,

*supra; D. L. Phillips, supra.* On the facts here, it is clear that there has been a change of purpose from farming to selling. This fact alone would not preclude capital gains treatment. It must be determined whether the sales were in the ordinary course of a business.

It is to be noted that only part of the subdividing and platting took place from 1939 through 1948, and of the 263 lots sold, only 30 were sold during this 10-year period. Most of the subdividing and platting and all other disclosed development and improvement of the land, including landscaping and installation of streets, water mains, and culverts were done in the years 1949 through 1953 at a total cost of $96,850.24. In 1951 petitioner, in two separate transactions, purchased a parcel of land which later became addendum No. 1 of subdivision 4, consisting of 14 lots. She purchased this parcel, encompassed by her other holdings, to protect the value of her property, and these purchases were the only ones she felt were necessary to fulfill that objective. During the same 5-year period, 233 lots were sold in 130 sales. These facts are more indicative of an active business operation during the later 5 years than of a passive and gradual liquidation over the 15-year period from 1939 through 1953.

Petitioner, as evidence of a passive liquidation, emphasizes that she did no advertising, either by newspaper listings, signs, or by any of the other conventional methods. However, conventional advertising is only one method of sales promotion, and the question is whether or not there were definite acts of sales promotion on the part of petitioner personally or through her agents. The improving and developing of the land during the period of 1949 through 1953 was directed to the promotion of sales. *Charles E. Reithmeyer,* 26 T. C. 804 (1956) ; *Brown v. Commissioner,* 143 F. 2d 468 (C. A. 5, 1944), affirming a Memorandum Opinion of this Court dated August 31, 1943; *Gruver v. Commissioner,* 142 F. 2d 363 (C. A. 4, 1944), affirming 1 T. C. 1204 (1943) ; *Snell v. Commissioner,* 97 F. 2d 891 (C. A. 5, 1938), affirming a Memorandum Opinion of this Court dated October 5, 1936.

Not much weight can be given to the fact that there was no advertising when to advertise would have been an unnecessary expense. That it was unnecessary to advertise is clear from testimony indicating that since the petitioner's subdivisions were located very close to Houma, they were generally known to the people of that city, and from petitioner's own words, "I don't see why I should advertise it when everybody was coming to me to buy it." Further, that there was great demand for her property, particularly as it was subdivided and improved by petitioner, is evinced by the frequency and continuity of sales in the years 1949 through 1953. So great was this demand that one parcel reserved for a future park was subdivided

and sold. Under such circumstances, the conventional methods of advertising are not necessary to put one in the business of selling. *C. E. Mauldin*, *supra;* see *J. Roland Brady*, 25 T. C. 682 (1955).

Petitioner stresses that the preliminary steps for each sale took place in her home and involved only a few minutes of her time. Petitioner did not have an office or a desk in her home. She contends that such a part-time informal activity could not constitute a trade or business. However, all the time that was necessary to carry out the transactions was taken by petitioner. The fact that the lots were readily accessible for examination by prospective purchasers and that there was a seller's market enabled petitioner to make each sale with a minimum of time and effort on her part. The fact that she devoted the time necessary to make such sales, coupled with the frequency and continuity of sales which were the sole source of her income during the taxable years in question, indicates that she was in the business of selling real estate. One can be in a business even though only part of his time is devoted to it; this is more readily found to be the case where, as here, a taxpayer's sole income is derived from such business. *C. E. Mauldin, supra; Snell* v. *Commissioner, supra.*

There was sufficient frequency and continuity of sales during the years 1949 through 1953 for a business operation as distinguished from isolated sales of property. *Commissioner* v. *Boeing*, 106 F. 2d 305 (C. A. 9, 1939), reversing 37 B. T. A. 178 (1938); *Ehrman* v. *Commissioner, supra; Snell* v. *Commissioner, supra; Charles E. Reithmeyer, supra.* Frequency and continuity of sales is also relevant in determining whether a taxpayer promoted sales. *Goldberg* v. *Commissioner, supra.* While the sales during the years 1949 through 1953 were due partly to favorable economic conditions, it is undoubtedly true that they were also promoted and stimulated by the substantial developments and improvements to the petitioner's land made during these years.

In this area of the law, it is often difficult to rely on specific and isolated factors alone to determine whether or not certain activities constitute a business. Each case must turn on its own particular factual background. Nevertheless, the cases relied on by petitioner are clearly distinguishable from the instant case.

Petitioner relies upon *Smith* v. *Dunn*, 224 F. 2d 353 (C. A. 5, 1955), but in that case the Court of Appeals found that the business being carried on belonged to another, an issue not present in the instant case. In *Consolidated Naval Stores Co.* v. *Fahs, supra*, there was no sales activity either by way of development or otherwise. Offers to purchase were refused although made at prices above prevailing market, the income from sales was only a small percentage of petitioner's

total revenue, and selling was only an incidental activity. In *Ross* v. *Commissioner*, 227 F. 2d 265 (C. A. 5, 1955), reversing T. C. Memo. 1954–177, there were only 38 sales in the 2 years, and a complete absence of any promotional activities by the taxpayer or anyone in his behalf. *Smith* v. *Commissioner*, *supra*, and *Goldberg* v. *Commissioner*, *supra*, both dealt with taxpayers who did nothing to promote sales and whose tenants exercised options to purchase, which options were mandatory under National Housing Agency regulations. These option cases also turn on their own facts, some of which have held that the taxpayer realized ordinary income. *Rollingwood Corp.* v. *Commissioner*, 190 F. 2d 263 (C. A. 9, 1951), affirming a Memorandum Opinion of this Court dated July 17, 1950; *Winnick* v. *Commissioner*, 223 F. 2d 266 (C. A. 6, 1955), affirming per curiam 21 T. C. 1029 (1954).

The instant case is factually not dissimilar to and is governed by the principles set forth in *C. E. Mauldin*, *supra*, and *Brown* v. *Commissioner*, *supra*.

We hold that the petitioner held the lots sold in 1951, 1952, and 1953 primarily for sale to customers in the ordinary course of her trade or business and that the gain realized from such sales is ordinary income rather than long-term capital gain.

There remains the question of whether petitioner is liable for additions to the tax under section 294 (d) (2) for substantial underestimation of estimated tax for the calendar years 1952 and 1953. The petitioner has introduced no evidence on this issue, and since we find that the petitioner is liable for the principal deficiency, we sustain the respondent on this issue.

Petitioner has conceded that Emmitt Hawkins did not qualify as a dependent for the calendar years 1952 and 1953.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

———

Mulroney, *J.*, dissenting: I respectfully dissent. I feel the facts show a gradual liquidation over a 15–year period of property purchased for farmland, with increased sales during the last few years due to fortuitous circumstances rather than an active business operation.

Petitioner, who had 4 years of the study of agriculture in college, ran this sugar plantation up until the land was rendered worthless for farming in 1936. Thereafter 2 or 3 people came to her to buy building sites and she sold small tracts to them. In 1939 she began to plat and subdivide areas of the land and make certain improvements consisting of landscaping, installing water mains, streets,

and culverts. She testified: "I was disposing of my property and that is all I thought about. I had to dispose of it, * * * I couldn't do anything with it." Thereafter petitioner sold lots and continued to plat, subdivide, and improve other areas and sell the lots in the subdivisions.

The way in which the sales were achieved is revealing. No advertising was done. No real estate agents or other salesmen were employed. Petitioner made no effort to show lots to prospective buyers. Purchasers were unsolicited. All the sales were made in petitioner's living room, quite informally, and with a minimum of time. There was no office setup in petitioner's home, nor was there any real estate listing in the telephone directory.

Respondent does not argue that the fact petitioner once held a real estate license and the fact that two pieces of property were purchased in 1951 and subdivided are factors that need be considered. I agree they have no importance. The real estate license was the mere equipment of an employee used but briefly in December 1923 and January 1924.

In the two purchases of property in 1951 petitioner acquired a small triangular piece of property (later subdivided into 14 lots) which was almost a bisecting wedge between the two major portions of her platted property. She testified this purchase was necessary "to protect the rest of my property. I had to buy it to keep somebody else from putting something objectionable right in the middle of my property." A glance at the plat in evidence will bear out her testimony in this respect. The other purchase in 1940 was of an abandoned railroad right-of-way which crossed her property. Such purchases, made under the circumstances disclosed in the record, are not inconsistent with the orderly liquidation of petitioner's property.

The factors, which respondent argues show that petitioner was engaged in the real estate business, are (1) the development of the area consisting of surveying, platting, landscaping, and installing water mains, streets, and culverts; (2) the continuity and frequency of sales; (3) the high profit petitioner realized from sales of lots during the years in question; and (4) the fact that the profits from the sale of lots were about her only income during the years in question.

The fact that petitioner undertook to plat and subdivide the area into lots and streets and install water mains and culverts would not, alone, put her into the business of selling real estate. *W. T. Thrift, Sr.*, 15 T. C. 366; *Boomhower* v. *United States*, 74 F. Supp. 997; and *Smith* v. *Dunn*, 224 F. 2d 353.

In *Smith* v. *Dunn, supra*, an architect determined to liquidate real estate, which he acquired by inheritance, by having it subdivided into

lots. He employed an engineer who made the surveys and subdivision and engaged a licensed real estate broker to handle the sale of lots for 10 per cent commission. The property was improved to the extent of constructing streets, water mains, and other improvements at a total cost of $32,000. All of the sales of lots were made by the real estate broker who carried on a continuous advertising campaign, advertising taxpayer's property with other property he handled. It was held taxpayer's activities with respect to the sales of the lots were not enough to put the taxpayer in the real estate business.

In the course of the opinion, the court held:

The court below seems to have had the idea that any taxpayer who seeks to make a better sale of a capital asset consisting of land forfeits the right to claim profits as capital gain by the mere fact of subdividing and seeking out purchasers, even though he does this by a regular real estate broker acting in the capacity we have described. We rejected that concept in Fahs v. Crawford, supra [161 F. 2d 315], and held that a lawyer who disposed of real estate originally purchased as an investment by selling it through a broker in subdivided lots was entitled to treat the profits as capital gain. * * *

It is clear that petitioner could achieve an advantageous liquidation of this useless farm by platting and subdividing the lands so that it could be sold in lots to many purchasers, which often is the only feasible way of disposing of such land. In order to carry out sales of small lots to many purchasers, it is obviously necessary to make a few basic improvements such as roads and water mains. The platting, subdividing, and improving here carried out were efforts directed toward that end. Such activity was, I feel, consistent with the orderly liquidation of a large tract of land by sales of small lots to many purchasers.

The main factors upon which respondent relies to show petitioner was in the real estate business are the continuity and frequency of sales. In the first 10 years after the platting commenced in 1939, petitioner sold 30 lots. In 1949, 7 lots were sold in 5 sales; in 1950, 58½ lots were sold in 37 sales; in 1951, 94 lots were sold in 44 sales; in 1952, 38½ lots were sold in 22 sales; and in 1953, 35 lots were sold in 22 sales.

It has often been said in cases like this that the continuity and frequency of sales is an important factor to be considered when the inquiry is as to whether the taxpayer was in the business of selling real estate. That is understandable for a high frequency of sales is usually indicative of an efficient business. But the frequency and continuity of sales factor is significant only so far as it reasonably justifies the conclusion that the continuity or high frequency of sales in certain years was the product of the promotional or sales activity of the owner. *Frieda E. J. Farley*, 7 T. C. 198. Here there was no

effort to sell lots, no solicitation or sales drive. The very plausible explanation of the continuity and frequency of sales is shown by petitioner's testimony.

Petitioner stated this plantation borders Houma, Louisiana, a town of about 15,000. She said a good many industries moved into Houma during and after the war years; that the town had about doubled in population in the years since 1939; and that by 1948 there became a considerable demand for residential lots. She also testified there were not any good residential areas around Houma other than her property, as the other land surrounding the town was largely swampland. The sale of 30 lots in the first 10 years is not a very high frequency of sales. The increased frequency of sales in the later years was due to the increased demand that worked to her advantage. I feel the continuity and frequency of sales, as shown by this record, are not a significant factor showing petitioner was in the real estate business. Under all of the facts the sales in the tax years in question, though it might be said they were continuous and frequent, were consistent with liquidation.

In *Consolidated Naval Stores Co.* v. *Fahs*, (C. A. 5) 227 F. 2d 923, timberland was acquired and used by the taxpayer for the production of turpentine. When the land was worked out the taxpayer sold the cutover land over a period of years without solicitation. The sales ranged from 2 in number totaling 117 acres in 1952 to over a hundred sales aggregating nearly 200,000 acres in 1937 and 241,000 acres disposed of in 40 odd transactions in 1942. The court held: "That there were a number of sales is true, but after sixteen years of selling, the taxpayer had over 400,000 acres remaining. It is hardly to be expected that a million and a half acres of land in separate tracts could be disposed of in a single sale." The court held the property was not held primarily for sale to customers in the ordinary course of trade or business.

Respondent points to the high profit realized in the years in question by the sales of lots in this area. In the year 1951 when 94 lots were sold for $87,950, the profit was $49,056.60. In the year 1952 when 38½ lots were sold for $42,700, the profit was $36,846.68. In the year 1953 when 35 lots were sold for $36,825, the profit was $25,169.03. This factor is related to the continuity and frequency of sales factor. She made more profit in these years because she made more sales. She made more sales because of fortuitous circumstances of a growing community and excellent location heretofore mentioned—not because of increased sales activity on her part. The high profit is no more of a significant circumstance than the continuity and frequency of sales factor.

Finally, respondent argues that the money from the sale of lots constituted her and her husband's only source of income, as shown

by their joint income tax returns. I fail to see how this is a very significant factor under the facts of this case. Respondent argues from this testimony, "it appears the only business petitioner had during such years was that of selling real estate lots." Petitioner was a housewife, taking care of her husband, a veterinary doctor who was in his last illness during most of this period. If petitioner ever had any business it was that of farming her own farm. No doubt that was once the only source of her individual income. It is stipulated the land was abandoned as a farm in 1936. It is understandable that thereafter the only source of her individual income would be the sales of the land previously used for farming. The "only source of income" factor has its place where some businessman-taxpayer is asserting he is not in the real estate business but in some other business and it appears the real estate sales are his only or his chief source of income. It has no place in a case like this where the question is whether a housewife and operator of her own farm is in the real estate business when selling her land after it was rendered useless for farming.

Petitioner's role in the sales during the tax years involved was a passive one, and necessarily so, since she was a housewife with an ill husband during all these years. Moreover, I think that the period of time, 15 years, is consistent with a comparatively gradual and passive liquidation of the property originally bought for cultivating sugar cane. *D. L. Phillips*, 24 T. C. 435. I do not think that petitioner's sales of the lots under these circumstances in the years 1951, 1952, and 1953 constitute a trade or business. I would hold that these lots were not held in the years involved primarily for sales to customers in a trade or business.

PIERCE, *J.*, agrees with this dissent.