William Thomas Minor, Jr. and Kathreen M. Minor v. Commissioner.
Minor v. Commissioner
Docket No. 57386.
United States Tax Court
T.C. Memo 1959-4; 1959 Tax Ct. Memo LEXIS 245; 18 T.C.M. (CCH) 14; T.C.M. (RIA) 59004; January 15, 1959
*245 Capital gains: Sales of lots. - Held, that lots sold by the petitioner did not constitute property held primarily for sale to customers in the ordinary course of trade or business, and that the gain derived constituted long-term capital gain. Held, further, that such gain did not constitute self-employment income subject to the tax imposed by section 480, I.R.C. of 1939. William Thomas Minor, Jr., Johnston Building, Charlotte, N.C., pro se. Harvey S. Jackson, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined a deficiency in income tax for *246 the calendar year 1952 in the amount of $950.84. The primary issue is whether the respondent erred in determining that lots sold by the petitioner in that year constituted property held primarily for sale to csutomers in the ordinary course of trade or business and that consequently the gain realized was ordinary income. A secondary issue is whether such gain constituted self-employment income and is therefore subject to the tax imposed by section 480 of the Internal Revenue Code of 1939. The deficiency of $950.84 includes such tax in the amount of $73.56. Findings of Fact Some of the facts were stipulated and the stipulations are incorporated herein by reference. The petitioners are husband and wife residing in Charlotte, North Carolina. They filed a joint Federal income tax return for the calendar year 1952 with the district director of internal revenue at Greensboro, North Carolina. The petitioner Kathreen M. Minor is a party only because of having joined with her husband in filing the return. The petitioner William Thomas Minor, Jr., will hereinafter be referred to as the petitioner. Since 1942 the petitioner has been engaged in the practice of his profession as an attorney *247 at law and as a certified public accountant. On December 31, 1945, he sold his family home in Charlotte, North Carolina, and in 1946 purchased two adjoining tracts of land located just outside the corporate limits of the City of Charlotte, for the purpose of locating a personal residence thereon. He was a licensed airplane pilot and he planned to construct a private runway for an airplane in front of his residence. The first tract was purchased on February 28, 1946, for $38,800. This tract was irregular in shape and in order to even out the boundaries he purchased the second tract on July 26, 1946, for $8,337.65. The total property thus acquired for $47,137.65 amounted to 180 acres. After acquisition of the land the petitioner made his home temporarily in an existing house on the land. It was his intention to live there until such time as his country residence could be built. He continued to live in the existing house until 1956, first with his father, and later with his wife after their marriage in 1948. In April 1947, a group of investors, who desired to purchase a part of the petitioner's property for a golf course to serve the public, approached the petitioner and offered him *248 $45,000 for 110 acres of the land. Since this was about as much as the petitioner had paid for the total 180 acres he decided to and did sell the 110 acres on June 19, 1947. After the decision to sell the 110 acres, the rest of the property lost its appeal to the petitioner as the site for a country residence, and he then sought to have the remainder of the land sold through an auctioneering firm in Charlotte. He entered into an agreement with the auctioneers on May 15, 1947, for an auction sale to be held immediately after final closing of the proposed sale of the 110 acres, the auctioneers to receive a commission of 10 per cent of sales. The auctioneers advised that the property should be subdivided. Accordingly, the petitioner had a survey made for subdivision, and a 36-acre triangular section of the land bounded on 2 sides by existing roads was subdivided and platted. The petitioner had 3 dirt roads cut through this area, thereby dividing this area into 4 blocks which were subdivided into a total of 83 lots. In addition, the petitioner had another block platted into 14 lots. He paid $3,248.51 to cut these 3 dirt roads and $1,129 for surveys and title costs, all of which was treated *249 by the petitioner as additional cost of the lots. Thereafter, on June 21, 1947, which was 2 days after the sale of the 110 acres, the auctioneers conducted an auction sale and sold 27 lots, for which they were paid commission and reimbursed expenses totaling $2,773.32. Following the auction sale held on June 21, 1947, the new property owners desired to impose certain restrictive covenants on all the subdivided property and accordingly a restrictive covenant instrument was executed by the petitioner on June 28, 1947, and was recorded. This covenant, among other thngs, restricted the property to residential use. On June 21, 1947 and October 15, 1947, the petitioner entered into agreements with J. L. Sides and the City of Charlotte, respectively, for the construction of water lines to serve the property in question. On September 19, 1949, he entered into another similar agreement with the City of Charlotte. In 1947, 1948, and 1949 the petitioner paid a total of $8,392.95 for construction of those water lines and for the tappage rights. The expenditures totaling $8,392.95 were reimbursed to the petitioner by persons who purchased lots both before and after construction of the water *250 lines. He was completely reimbursed by October 7, 1954. These amounts totaling $8,392.95 were carried on the petitioner's books in a separate account from the sale of lots and were not treated by the petitioner as a cost of lots sold, but rather as reimbursable expenditures for the purchasers of lots. On October 5, 1954, the petitioner assigned to Massie Construction Corporation all his interest in these water lines and the latter agreed to grant authority to tap the water lines to those who might desire water tappage, upon payment of proper charges. The petitioner again engaged the same auctioneers to undertake an auction sale in 1948. Prior to this sale, however, the petitioner had another survey map made to subdivide another part of the land into 7 lots, bringing the total subdivided lots to 104. This was done to make the property available for sale as required by the auctioneers. At the 1948 auction sale 8 lots were sold. Thereafter the petitioner did not engage the auctioneers. From time to time from 1949 through 1953, he, himself, sold lots as follows: 1949
3 lots
1950
4 lots
1951
1 lot
1952
7 lots
1953
5 lots No additional sales have been made since *251 1953 from the remaining acreage of the land purchased in 1946. In addition to the above sales of lots the petitioner made gifts of various lots to his father, W. T. Minor, Sr., as follows: 1948
4 lots
1949
2 lots
1950
5 lots
1951
1952
6 lots These lots were sold by the petitioner's father at various times in order to meet his expenses of a serious illness. In addition, petitioner in 1952 made a gift of 4 lots to his wife who exchanged them for other vacant land. The petitioner bought no other real property between 1946 and 1953. During the period 1949 to 1953 when the petitioner himself was selling lots he did not advertise or otherwise solicit sales of the property nor did he undertake to sell through real estate dealers or brokers. He did not maintain a real estate office, nor had he ever been issued a real estate license. He carried the property on his books as a capital investment. Almost all of the 20 lots sold by the petitioner from 1949 through 1953 were sold to small contractors who sought the lots in order to construct homes on them. Of the lots sold in 1952, 3 were sold to a real estate dealer and 3 were sold to persons who had previously purchased *252 lots in the subdivision. Two of the lots sold in 1952 fronted on a road which was in existence prior to the petitioner's purchase in 1946 and which was maintained by the state highway department. The other lots sold in that year fronted on a dirt road which had been cut in 1947. The petitioner made no improvements at all in 1952 to the property which was sold in that year. On the sales of the 7 lots in 1952 the petitioner realized $4,905 to which a cost basis of $1,635.47 was allocated, resulting in a gain of $3,269.53, which was reported by the petitioner as a long-term capital gain. In his return for 1952 the petitioner showed gross income of approximately $96,000 and net income of approximately $34,000 from his professional practice as an attorney and accountant. In the notice of deficiency the respondent determined that the lots sold were held primarily for sale to customers in the ordinary course of the petitioner's trade or business and that the petitioner realized ordinary income during the taxable year in the amount of $3,269.53 from the sale thereof. He also determined that such amount constituted self-employment income and determined that petitioner was liable for a tax *253 of $73.56 thereon under section 480 of the Internal Revenue Code of 1939. The lots sold by the petitioner in 1952 did not constitute property held primarily for sale to customers in the ordinary course of trade or business. Opinion The primary issue is whether the profits derived by the petitioner in the year 1952 from the sales of lots were gains from the sale of capital assets and entitled to long-term capital gain treatment as contended by the petitioner, or whether they constituted ordinary income as profits from sale of property held primarily for sale to customers in the ordinary course of trade or business, as held by the respondent. Pertinent provisions of section 117 of the Internal Revenue Code of 1939 are set forth in the margin. [1]
*254 This and other courts have decided numerous cases in which this question has been presented under varying circumstances. In the final analysis each case must be decided in the light of its particular facts. Many factors are to be taken into consideration, but no one factor is decisive. In W. T. Thrift, 15 T.C. 366, 369, we enumerated some of the important factors as follows: "The governing considerations have been the purpose or reason for the taxpayer's acquisition of the property and in disposing of it, the continuity of sales or sales related activity over a period of time; the number, frequency, and substantiality of sales, and the extent to which the owner or his agents engaged in sales activities by developing or improving the property, soliciting customers, and advertising. Boomhower v. United States, 74 Fed. Supp. 997. No one of these tests can be regarded as determinative but the question must be viewed in the light of all pertinent factors and particularly the facts of the individual case." It has been recognized that one may liquidate an asset in the most advantageous way and still obtain capital gains treatment, but the question is whether *255 at the time of sale the property is held merely for liquidation or whether the owner has entered into business and is holding the property primarily for sale to customers in the ordinary course of the business. Frieda E. J. Farley, 7 T.C. 198; Martin Dressen, 17 T.C. 1443; Estate of Luke J. Barrios, 29 T.C. 378; Camp v. Murray (C.A. 4), 226 Fed. (2d) 931 (reversing D.C.E.D. Va.); and Home Co. v. Commissioner (C.A. 10), 212 Fed. (2d) 637, affirming a memorandum opinion of this Court. In the last cited case the Court of Appeals stated: "One may, of course, liquidate a capital asset. To do so it is necessary to sell. The sale may be conducted in the most advantageous manner to the seller and he will not lose the benefits of the capital gain provision of the statute, unless he enters the real estate business and carries on the sale in the manner in which such a business is ordinarily conducted. In that event, the liquidation constitutes a business and a sale in the ordinary course of such a business and the preferred tax status is lost." Here the petitioner acquired the property in question in 1946 for the purpose of *256 constructing thereon a country residence and his private airplane runway. The respondent agrees that this was the purpose of the acquisition, but argues that the petitioner, in later causing a part of the property to be subdivided into lots, making improvements, and selling lots, entered into business and that the lots sold in 1952 constituted property held primarily for sale to customers in the ordinary course of trade or business. From a consideration of the whole record, we are of the opinion that the respondent erred in his determination. In the year following the purchase of the land, and before carrying out his plan to construct a residence, the petitioner was approached by certain individuals who offered him almost as much for 110 acres, to be used as a public golf course, as petitioner had paid for the full 180 acres. The petitioner decided to and did sell the 110 acres. Thereafter, the remaining property was underirable for his original purpose and he decided to dispose of it. To that end he employed an auctioneering firm to dispose of such property. In accordance with the advice of the auctioneers the property was subdivided (ultimately into 104 lots), and certain dirt *257 roads were cut through the property. The petitioner paid $1,129 for surveys and title costs and $3,248.51 for the roads. The auctioneers at a sale held in 1947 were able to sell only 27 lots. Thereafter, in 1947, 1948, and 1949 the petitioner made expenditures totaling $8,392.95 for construction of water lines to the lots already sold and those unsold. Again in 1948 the same auctioneers attempted to dispose of the property, but sold only 8 additional lots. Thereafter the petitioner made no further substantial attempts to sell any of the lots. He did not advertise or otherwise solicit sales, nor did he put the property in the hands of any real estate broker or dealer. From 1949 through 1953 he personally sold 20 lots, an average of 4 lots per year. In the year in question, 1952, he sold 7 lots. Almost all of these sales were to small contractors who intended to improve the property by constructing houses. The petitioner had never been in the real estate business and had no real estate license. He bought no other real estate during the period from 1946 through 1953. His profession was that of lawyer and accountant, and the gross income derived from that business was about $94,000, whereas *258 gross receipts from the sales of 7 lots in 1952 was only about $5,000. Under all the circumstances, it is our opinion that the activities in connection with the development and sale of the property and the investment in the improvements thereon were not sufficiently great as to justify or require the conclusion that the petitioner had entered into the business of subdividing and selling lots. Rather, we think that the petitioner was merely attempting to dispose, to his best advantage, of the remaining property which he had originally acquired for the purpose of his own residence. We have accordingly concluded and have found as a fact that the lots sold by him in the year in question did not constitute property held primarily for sale to customers in the ordinary course of trade or business. Inasmuch as the property sold in 1952 had been held by the petitioner for more than 6 months, the gain derived therefrom constituted long-term capital gain within the meaning of section 117 of the Internal Revenue Code of 1939. The respondent having determined that the profit on the sale of the lots in 1952 constituted profit in a business conducted by the petitioner, held that such profit constituted *259 self-employment income, subject to the tax imposed by section 480 of the Internal Revenue Code of 1939. Section 481 defines "self-employment income" as the net earnings from self-employment. In turn, "net earnings from self-employment" is defined in section 481 as "the gross income derived by an individual from any trade or business carried on by such individual," less deductions. Section 481(a)(4) also provides that in computing such gross income there shall be excluded any gain which is considered as gain from the sale or exchange of a capital asset and gain which is not from the sale of property held primarily for sale to customers in the ordinary course of the trade or business. In view of our holding that the petitioner was not engaged in the business of subdividing and selling lots, and that hence the lots sold were not property held for sale to customers in the ordinary course of a trade or business, and that the gain was from the sale or exchange of capital assets, it follows that the respondent erred in determining that the gains in question constituted self-employment income subject to the tax imposed by section 480 of the Code. Decision will be entered under Rule 50. *260 Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *
(4) Long-term capital gain. - The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income; * * *
(b) Deduction from Gross Income. - In the case of a taxpayer other than a corporation, if for any taxable year the net long-term capital gain exceeds the net short-term capital loss, 50 per centum of the amount of such excess shall be a deduction from gross income. * * *↩