Aaron Jenkins and LaMae S. Jenkins v. Commissioner.Jenkins v. CommissionerDocket No. 1567-69 SC.United States Tax CourtT.C. Memo 1970-53; 1970 Tax Ct. Memo LEXIS 308; 29 T.C.M. (CCH) 240; T.C.M. (RIA) 70053; March 2, 1970, filed. *308 Held, that gains upon sales of certain unimproved real estate sales of property held primarily for sale to customers in the ordinary course of a trade or business. Narrvel E. Hall, for petitioners. Peter M. Ritteman, for respondent. ATKINSMemorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income and self-employment tax for the taxable years 1965 and 1966 in the amounts of $894.02 and $638.06, respectively. Certain issues having been conceded by petitioners, the only issue remaining is whether the gain derived from the sale of real estate constituted capital gain or ordinary income. The determination of this issue will also affect the amount of self-employment income subject to the self-employment tax. Findings of Fact Some of the facts have been stipulated*309 and are incorporated herein by this reference. Petitioners, Aaron Jenkins and LaMae Jenkins, are husband and wife and were such during the taxable years 1965 and 1966. At the time of the filing of the petition herein, petitioners were residents of Midvale, Utah. They filed their joint Federal income tax return for the taxable year 1965 with the district director of internal revenue at Salt Lake City, Utah, and their joint Federal income tax return for the taxable year 1966 with the Western Service Center of the Internal Revenue Service at Ogden, Utah. While both petitioners were parties to the several real estate transactions involved herein, for convenience the petitioner Aaron Jenkins will hereinafter be referred to as the petitioner. The petitioner has worked as an independent contractor in the securities and insurance business since 1959. In addition, during the period between January 1963 and October 1964, petitioner was self-employed in operating a retail grocery store. During the years 1962 through 1966, inclusive, petitioner also held a real estate agent's license under the laws of the state of Utah. However, during such period petitioner had no employment as a real estate*310 agent. Petitioner kept his license in force for all of this time so that if at any subsequent time he decided to operate as a real estate agent he would not have to retake the state examination. In 1961 petitioner became interested in buying as an investment undeveloped real estate in Antelope Valley, an area near Edwards Air Force Base in Los Angeles County, California. Petitioner thought that this would be a means to provide some security for his retirement and began to purchase land there in 1961. He had friends in the California real estate business who contacted him periodically when they found property for sale in which they thought he might be interested. At the beginning of 1964 petitioner held about 80 acres of land in Antelope Valley, which he still held at the time of the trial of this case. In January of 1964, petitioner was contacted in Salt Lake City by a real estate broker who had some land available in Antelope Valley. Petitioner told him to hold the land until he could come to California to sign the papers to purchase it. By this time petitioner had decided to liquidate his grocery businesssince it had become unprofitable and was looking for employment as a salesman*311 of securities and insurance. In conection with this, petitioner visited Glenn Otten, a friend of his, in Las Vegas, Nevada. During the course of their discussions, petitioner mentioned that he 241 was buying real estate in a rapidly expanding area in California. Otten expressed a desire to invest in such property and inquired how he could buy some. Petitioner told him that he had some property which he would sell him. Otten then decided to accompany petitioner to California. While there petitioner purchased 20 acres of land in Antelope Valley on January 27, 1964 for $5,990. While in California Otten had occasion to inspect the Antelope Valley area with petitioner. Since petitioner was not licensed in the real estate business in California, he could not show Otten any specific property for sale except the property which he himself owned. Otten became particularly interested in the property which petitioner had just purchased and offered to buy it from petitioner. On February 1, 1964, petitioner sold this 20 acres to Otten for $10,000. In March 1964 petitioner was contacted in Salt Lake City by another real estate broker who had available two 20-acre tracts in Antelope Valley. *312 He went to California and purchased the two tracts on March 3, 1964 for $5,490 each. He was accompanied by his brother-in-law, LaVon Whitney, who was interested in this type of investment. Whitney had become aware of petitioner's interests in California real estate as a result of informal conversations that occurred at monthly parties held by the family of petitioner's wife. While in California, petitioner showed Whitney the general area of Antelope Valley and the property that he owned. Shortly after returning from California, Whitney offered to purchase some of petitioner's land. On March 5, 1964, petitioner sold him, for $10,000, one of the two 20-acre tracts purchased on March 3, 1964. Later in March 1964, petitioner was again contacted by a real estate broker who had property available in Antelope Valley. Petitioner again travelled to California and on March 24, 1964, purchased the property, consisting of 20 acres, for $5,990. On this occasion, he was accompanied by Dr. Stan Hutchings, another brother-in-law, and his brother, Dr. Calvin Hutchings. The doctors had become aware of petitioner's investment as a result of the monthly family gatherings and through Whitney's dealings*313 with petitioner. They inquired whether petitioner could help them to select property to buy in the Antelope Valley area. While in California, petitioner showed the doctors the area and told them that he would sell them the property he owned if they wanted it. After he had returned to Salt Lake City petitioner was contacted by Dr. Calvin Hutchings and on April 29, 1964, sold him, for $11,000, the 20-acres purchased on March 24, 1964. Petitioner was separately contacted by Dr. Stan Hutchings and on May 16, 1964, sold him, for $10,000, the remaining 20-acre tract purchased on March 3, 1964. In May 1964, petitioner was again contacted by a California real estate broker and, as a result of this, purchased a 20-acre tract in Antelope Valley for $4,000 on May 8, 1964. During this period, petitioner was in the process of liquidating his grocery business. In connection with this, he contacted Don Gibb, a frined of his who was also liquidating a retail grocery business. The conversation turned to investments and petitioner referred to his real estate holdings in California. A day or two later, Gibb called petitioner and asked whether he could make an investment in that area. At petitioner's*314 suggestion Gibb accompanied him to California to inspect the area and as a result, on July 31, 1964, petitioner sold him, for $11,000, the 20 acres purchased on May 8, 1964. On October 10, 1964, petitioner purchased a 60-acre tract in Antelope Valley for $18,000. In October 1964 petitioner completed the liquidation of his grocery store and undertook to seek new employment. He spent a month in Las Vegas and then contacted a company in Wichita, Kansas, about employment to sell a special type of contract issued by a new insurance company. Also working in Kansas at that time was Q. Perry Hislop another business associate and friend of petitioner. While waiting for employment petitioner and Hislop discussed in some detail the real estate market in Antelope Valley, California. Hislop already had some familiarity with the real estate market in Antelope Valley prior to this contact with petitioner. Petitioner also discussed his California holdings with other salesmen working for the same company. Employment conditions were not to petitioner's liking and in the early part of 1965, he severed the relationship and returned to Utah. About April 1, 1965, petitioner was contacted by a California*315 real estate broker and was offered an 80-acre tract of land in Antelope Valley. Petitioner felt that this was too large a purchase to undertake alone and therefore contacted Hislop who had previously expressed interest in buying property in this area. As a result, petitioner and 242 Hislop went to California to inspect this property and on April 19, 1965, petitioner purchased 40 acres of this tract for $11,000 and Hislop purchased the remaining 40 acres. Later in April 1965, petitioner was persuaded by another friend, Reed Fuller, to return to Kansas to consider resuming employment there. During the course of the trip back, at Fuller's request, petitioner discussed his California holdings. The employment was unacceptable to petitioner and he decided to leave Kansas. Before leaving he was approached by an employee of the company, June Hegge, and a friend of hers, Marie Sullivan, concerning investing in California real estate. Hegge and Sullivan were referred to petitioner by Hislop. Hislop had discussed purchasing real estate with them and encouraged them to buy in California because he thought it was a good area and was going to buy there himself. When they showed some interest, *316 Hislop suggested they talk to petitioner because of his greater familiarity with the area. As a result of their discussions, June Hegge asked petitioner if he had some land for sale and on April 27, 1965, petitioner sold her, for $12,000, 20 acres from the 60-acre tract purchased on October 10, 1964. On April 29, 1965, petitioner sold Marie Sullivan for $6,950, 10 acres of the 40-acre tract purchased on April 19, 1965. Before leaving Kansas, petitioner also discussed his estate in California with Dr. Richard Rogers. Dr. Rogers had become interested in purchasing some such property as a result of prior conversations with Hislop. Hislop had inquired of petitioner whether he would sell Rogers a certain 10 acres which he thought would be the most desirable purchase for Rogers. As a result of this, on May 1, 1965, petitioner sold Dr. Rogers, for $7,500, 10 acres of the property purchased on October 10, 1964. Petitioner made these last three sales in Kansas at a time when he was unemployed and needed money. After completing these sales petitioner returned to Utah. From Salt Lake City, petitioner then went to California to seek employment in selling stock in a new insurance company. Hislop*317 also became interested in this venture. Each made application for the necessary license and stayed in California for several months, sharing an apartment, until they learned that licenses would not be issued to them. During such period they spent their time investigating real estate in the Antelope Valley area. At Hislop's suggestion, they both enrolled in a real estate school and, after completing the course, petitioner took the California real estate board's examination. Upon passing the test and paying the fee, petitioner received a real estate agent's license, in force for one year commencing August 4, 1965. During the time that petitioner and Hislop were in the real estate school their interest in real estate was stimulated to the point that they thought they would like to go into the real estate business. In order to test the real estate market they engaged a mailing service to send not less than 500 letters to persons selected by such mailing service stating that the senders owned, and were making available for sale, some unidentified parcels of real property located in northern Los Angeles County. There were but few replies, all from California real estate brokers. As a result*318 the petitioner abandoned any idea of operating a real estate business in California. At the beginning of August 1965, petitioner decided to leave California since it had become apparent that he would not obtain a license to sell stock. Petitioner's decision was also induced by the unsatisfactory response to the above-described private mailing. During the time petitioner was in California as above-described he was visited by Reed Fuller who because of prior conversations with petitioner had become interested in the property petitioner owned. On May 15, 1965, petitioner sold Fuller, for $20,000, 20 acres of the 60 acres purchased on October 10, 1964. Subsequently, on June 6, 1965, petitioner transferred to Hislop the remaining 10 acres of this property for $10. Petitioner made this transfer to satisfy what he considered to be a moral obligation to Hislop for past favors which Hislop had done for him, including assistance in completing the underwriting of a stock issue in Nevada, instructing him as to selling insurance contracts in Kansas, nursing him through an illness and arranging the above-mentioned sales to Hegge, Sullivan, and Rogers. Petitioner had never requested Hislop to promote*319 sales of realty for him. While in California petitioner made the following purchases of real estate in Antelope Valley: June 22, 1965, 20 acres; July 6, 1965, 40 acres; and July 26, 1965, 15 acres. When petitioner returned to Utah about the beginning of August 1965, he contacted a family friend, Mark Haws, with regard to placing his father in Haws' rest home in Provo, Utah. During the course of the conversation, the subject of petitioner's 243 California real estate came up and Haws expressed a desire to buy some. On August 12, 1965, petitioner sold Haws, for $12,000, 20 acres of the property purchased on April 19, 1965. No other purchases or sales of California property were made by petitioner thereafter in 1964 and none were made in the taxable year 1966. All of the sales of real estate in California made by petitioner in 1964 and 1965 were on the installment basis, with 6 percent interest payable on the unpaid balances. Petitioner's purchaes of land in California were also on the installment basis, with interest payable on the unpaid balances. Petitioner financed these purchases either with money obtained from sales of property or through borrowing against his residence*320 or other property that he owned. As to purchases that he had made prior to 1964, petitioner had been able to pay for them without relying on the sale of any of such property. Petitioner never made any improvements to any of the land which he owned in California and never had it surveyed. None of the sales of California property were the result of an active attempt by petitioner to sell his property. The property was never listed for sale with any brokers. Rather, through contact with petitioner, people became aware of his holdings in California and, when they became interested in purchasing, petitioner sold to them if they were willing to pay the price that he asked. In the taxable years 1964, 1965 and 1966, petitioner received interest income in the amounts of $1,596.55, $4,184.95 and $5,140.60, respectively, derived from his installment sales of real estate in California in 1964 and 1965. In the taxable years 1964, 1965, and 1966, petitioner paid interest in the amounts of $1,337.58, $2,393.53 and $3,452.49, respectively, on his installment purchases of real estate in California in 1964 and 1965. Thus, for the taxable years 1964, 1965, and 1966, the excess of interest received*321 over interest paid with respect to the California real estate deals was $258.97, $1,791.42 and $1,688.11, respectively. The following is a summary of petitioner's sales of real estate in California in 1964 and 1965, the total gain therefrom and the amount of gain received therefrom on the installment method in the taxable years 1965 and 1966: Pet's.AcquisitionHoldingAcquisitinPurchaserDatePeriodPurchaseSale PriceGlenn Otten1-27-642-1-644 DaysLaVon Whitney3- 3-643-5-642 Days$ 5,990Mark Haws4- 19-658-12-653 Mo. 24Days6,000Reed Fuller10-10-645-15-657 Mo. 5Days3,000Richard Rogers10-10-645-1-656 Mo. 20Days2,750Marie Sullivan4- 19-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 Days6,000June Hegge10-10-644-27-656 Mo. 16Days4,000D on Gibb5- 8-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 Days5,990Calvin Hutch- ings3-24-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 Days5,490Stan Hutchings3- 3-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 Days5,4905,50012,0006,500789.99449.66Glenn Otten1-27-642-1-644 Days$ 5,990Totals$50,210ContractGainGainPurchaserGainRec'd. 1965Rec'd. 1966Glenn OttenLaVon Whitney$ 10,000$ 4,010$ 296.25$ 314.54Mark Haws20,00014,0001, 833.37948.57Reed Fuller7,5004,5001,049.23268.25Richard Rogers6,9504,200999.67305.69Marie Sullivan12,0006,0001,402.46364.04June Hegge11,0007,000483.97513.98D on Gibb11,0005,010380.68373.76Calvin Hutch- ings10,0004,510316.58313.91Stan Hutchings10,0004,510305.49324.345,500Glenn Otten$ 10,000$ 4,010$ 296.2$110,450$60,240$7,857.69$4,176.74*322 In his income tax returns the petitioner claimed 4 dependency exemptions for each of the years 1962, 1965, and 1966. He claimed 5 exemptions for the years 1963 and 1964. In his returns for 1962 and 1963 he reported adjusted gross income in the respective amounts of $3,621.30 and $4,626.73. In his income tax return for the taxable year 1964, the petitioner reported dividend income in the amount of $87.78, commission 244 income from sales of insurance and securities in the amount of $85.13, interest income in the amount of $4,737.84, including the amount of $1,596.55 received from his installment sales of California real estate. He also reported gross gains from sales of real estate in the amount of $12,220.82, including the amount of $2,847.41 reported on the installment method as the gain from sales of California real estate. Among deductions the petitioner claimed $5,123.33 as interest paid, including the amount of $1,337.58 paid on his installment purchases of real estate in California. He also reported gross profit in his grocery business of $20,818.09, but expenses of $22,603.42, resulting in a net operating loss of $1,785.33. Petitioner also claimed as a business expense*323 the amount paid for his Utah real estate agent's license. In his income tax return for the taxable year 1965, the petitioner reported dividend income in the amount of $162.80, commission income from sales of insurance and securities in the amount of $3,654.37, interest income in the amount of $9,060.35, including the amount of $4,184.95 received from his installment sales of California real estate. He also reported as gross gains from sales of real estate the amount of $14,120.50, including the amount of $7,857.609 reported on the installment method as the gain from the sales of California real estate. Among deductions the petitioner claimed $6,817.07 paid as interest, including the amount of $2,393.53 paid on his installment purchases of real estate in California. Petitioner hases also claimed as business expenses the amounts paid for his Utah and California real estate licenses and the amounts of $439.15 paid for the above-described private mailing in California. In his income tax return for the taxable year 1966, the petitioner reported dividend income in the amount of $187.80, commission income from sales of insurance and securities in the amount of $7,308.64, and interest*324 income in the amount of $8,699.15, including the amount of $5,140.60 received from his installment sales of California real estate. He also reported as gross gains from sales of real estate the amount of $10,684.70, including the amount of $4,176.74 reported on the installment method as the gain from the sales of California real estate. Among deductions, the petitioner claimed $7,026.51 paid as interest, including the amount of $3,452.49 paid on his installment purchases of real estate in California. Petitioner also claimed as a business expense the amount paid for his Utah real estte license. In his returns for the taxable years 1965 and 1966, petitioner reported the gain from the sales of the California property as gain from sales of capital assets, reporting the gain from the three properties held for more than six months as long-term capital gain. In the notice of deficiency the respondent determined that the reported gains upon the sales of California property represented ordinary income, rather than short and long-term capital gains as petitioner claimed, and increased petitioner's taxable income for the taxable years 1965 and 1966 by the respective amounts of $2,142.53 and*325 $790.43. The respondent also, in computing the petitioner's self-employment income, included therein the gains from the sales of California real estate. The properties in Antelope Valley, California, which the petitioner sold in 1964 and 1965 constituted capital assets in his hands and not propety held by him primarily for sale to customers in the ordinary course of a trade or business carried on by him. Opinion The issue presented is whether the portions of installment payments received by petitioner in 1965 and 1966 representing gains from sales of unimproved real estate in Antelope Valley, California, in 1964 and 1965 constituted ordinary income as determined by the respondent, or capital gains. This depends upon whether the properties sold were capital assets within the meaning of section 1221(1) of the Internal Revenue Code of 1954. 1 The respondent's position is that they were not such, but were properties "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." He cites Corn Products Refining Co. v. Commissioner, 350 U.S. 46, for the proposition that the capital gains provisions, as an*326 245 exception to the normal tax rates, are to be narrowly construed. The Supreme Court there pointed out that Congress intended that profits and losses arising from the everyday operation of a business are to be considered as ordinary income or loss rather than capital gain or loss, that the preferential treatment applies to transactions in property which are not the normal source of business income, and that it was intended to relieve the taxpayer from excessive tax burdens on gains resulting from a conversion of capital investments and to remove the deterrent effect of those burdens on such conversions. The respondent contends that the petitioner's purchases and sales of properties*327 in Antelope Valley, California, in 1964 and 1965 constituted a trade or business and that such properties were held for sale to customers in the ordinary course of such trade or business. Although there have been many cases considering this issue in a variety of factual contexts, the ultimate decision depends upon a consideration of all the pertinent facts in the particular case. Many factors have been detailed by the courts as aids in determining this issue, although no one test is necessarily decisive. Among the criteria used are the purpose of the taxpayer in acquiring the property; the continuity and frequency of sales as opposed to isolated transactions; the substantiality of the income from the sales; and the activity of the seller with respect to the property, such as the presence or absence of improvements to increase its marketability or activities in promoting sales, including advertising or listing with real estae brokers. See W. T. Thrift, Sr., 15 T.C. 366; and Scheuber v. Commissioner (C.A. 7) 371 F. 2d 996. It is our conclusion that the petitioner's activity in purchasing and selling the unimproved real estate in Antelope Valley did not constitute*328 the conduct of a trade or business. Accordingly, the properties in question sold did not constitute properties held primarily for sale to customers, within the meaning of the statute, but constituted capital assets, and we have so found as a fact. The petitioner testified that he first began purchasing real estate in Antelope Valley in 1961 as a means of providing some security for his retirement. Prior to the 1964 and 1965 transactions, petitioner had acquired about 80 acres with this purpose in mind, and has continued to hold such property. In 1964 and 1965 he engaged in 21 separate transactions involving Antelope Valley real estate. He made 10 purchases, totalling 275 acres, 10 sales involving 180 "moral obligation" to a friend and business associate. After each of the various sales involved, petitioner purchased other unimproved real estate in Antelope Valley whenever he was financially able to do so. He testified, in effect, that his intention in so purchasing was to invest. By the end of 1965 he held 85 acres of land in Antelope Valley, in addition to the 80 acres originally purchased with a view towards retirement, and continued to hold all this property during the entire*329 taxable year 1966, there being no sales of Antelope Valley property in that year. As indicated, the property purchased and sold was unimproved real property. Petitioner never made any improvements thereto. The land was never surveyed and there was no formal attempt to subdivide the property to make it more readily marketable. None of the sales of Antelope Valley real estate that petitioner made in 1964 and 1965 were the result of actie efforts by him to sell the property. The properties were not listed with any broker, and none of the sales resulted from advertising. 2 Most of the sales were made either to friends and business associates or to relatives. These sales resulted from informal and causal conversations with petitioner wherein the prospective purchaser became aware of petitioner's real estate holdings and expressed a desire to invest in such property. Petitioner did nothing to promote these sales but when these purchasers expressed 246 a desire to buy some of his property he accepted their offers. Three of the sales were made through contacts arranged by petitioner's friend and business associate, Hislop, but petitioner had not requested Hislop to solicit sales for*330 him. The respondent makes the contention that the number of transactions indicates that the petitioner was conducting a trade or business. However, in the light of the facts that the petitioner had commenced in 1961 to purchase land in Antelope Valley, that there were no sales of any of such property after August 1965, and that there were no sales in the*331 taxable year 1966, it is our conclusion that the transactions were not so continuous and frequent as to rise to the level of the conduct of a business. The petitioner admitted that his property was always for sale if the right price were offered. However, as stated in Burkhard Investment Co. v. United States, (C.A. 9) 100 F. 2d 642, there are few, if any, owners of property who will not sell if a high enough price is offered, and in this sense all property may be held for sale, but this is not inconsistent with a conclusion that the property was purchased and held as an investment. We think the petitioner's property was held for investment, even tough some of it was sold within a very short time after it had been purchased, and even though the amount of income from the sales was substantial by comparison with his other income. In this connection we note that petitioner did have substantial income from his business of selling insurance and securities and reported substantial capital gains from sales of other real estate not questioned by the respondent. In view of the foregoing, we hold that the respondent erred in determining that the gains received by the petitioner*332 in the taxable years 1965 and 1966 from the sales of Antelope Valley real estate were ordinary income and not short and long-term capital gains, as reported by petitioner. It follows that the respondent also erred in computing petitioner's self-employment tax by including such gains in petitioner's self-employment income. See section 1402 of the Internal Revenue Code of 1954. Decision will be entered under Rule 50. Footnotes1. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;↩2. While in 1965 the petitioner did arrange for a private mailing of letters in California stating that he had real estate for sale, we are satisfied that such mailing was for the purpose of testing the real estate market to determine whether it would be advisable to enter into the real estate business and that it did not constitute solicitation of customers in a business in which petitioner was already engaged. No sales resulted from these letters. It may be also added that although petitioner acquired a California real estate agent's license for one year commencing August 1965, he did not use it. Further, although he had a Utah real estate's agent's license, he did not have any employment as a real estate agent. Moreover, the possession of a Utah license has no direct bearing on the California transactions here involved.↩